IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
ATHENS DIVISION

| | | |
|---|---|---|
| DAVID P. ECHOLS STANLEY L. DOVE ALEX F. MATHEWS JAMES W. DOVE AND TERESA K. DOVE D/B/A TRINITY FARM AND SANDRA K. WHITE, BILLY M. WHITE SR. AND BILLY M. WHITE JR. D/B/A BMW FARMS | ) ) ) ) ) ) ) ) | CIVIL ACTION FILE NO. _____ |
| | ) | DEMAND FOR JURY TRIAL |
| Plaintiffs | ) ) | |
| v. | ) ) | |
| PILGRIM'S PRIDE CORPORATION | ) ) ) | |
| Defendant | ) | |

## COMPLAINT FOR DAMAGES

COME NOW David P. Echols, Stanley L. Dove, Alex F. Mathews, James W. Dove and Teresa K. Dove d/b/a Trinity Farm, and Sandra K. White, Billy M. White, Sr. and Billy M. White, Jr. d/b/a BMW Farms (collectively, the "Plaintiffs"), and show the Court as follows:

## NATURE OF ACTION

1.     Pilgrim's Pride Corporation ("Pilgrim's" or "Defendant") contracts with farmers such as Plaintiffs to grow chickens.

2.     In 2017, Pilgrim's undertook a strategic scheme to force out a number of older and smaller family farmers who grew chickens for Pilgrims' Athens, Georgia facility.

3.     Under the guise of responding to Chick-fil-A's purported demand for No Antibiotics Ever (NAE) chicken, Pilgrim's demanded that 48 growers, including every Plaintiff, make costly and expansive upgrades to their existing growing facilities, which have limited other uses and were costly to construct and maintain.

4.     Pilgrim's, however, never intended for most of these growers to make the upgrades.  Instead, in breach of a number of contracts and in violation of the federal Packer and Stockyards Act and the related USDA regulations, Pilgrim's made these demands for the purpose of pushing the growers out of the chicken business.

5.     In addition to orally discouraging many of the Plaintiffs from making the upgrades, Pilgrim's materially understated the price per pound available to the growers for NAE production after completion of the upgrades, reduced the chick placement per square foot, increased the downtime between flocks, and undertook other unfair practices aimed at forcing the Plaintiffs out of the chicken business.

6.     Plaintiffs in this case seek to hold Pilgrim's liable for its unfair and illegal practices.

## THE PARTIES, JURISDICTION AND VENUE

7.     Plaintiff David P. Echols ("Echols"), an individual, is a resident and a citizen of Madison County, Georgia.

8.     Plaintiff Stanley L. Dove ("Dove"), an individual, is a resident and a citizen of Madison County, Georgia.

9.     Plaintiff Alex F. Mathews ("Mathews"), an individual, is a resident and a citizen of Oglethorpe County, Georgia.

10.    Plaintiffs James W. Dove and Teresa K. Dove, each an individual and together, a husband and wife, are residents and citizens of Madison County, Georgia.  James W. Dove and Teresa K. Dove previously did business as Trinity Farm and shall be known hereinafter collectively as "Trinity Farm."

11.    Plaintiffs Sandra K. White, Billy M. White, Sr. and Billy M. White, Jr., each an individual and together, a husband, wife, and son, respectively, are residents and citizens of Oglethorpe County, Georgia. Plaintiffs Sandra K. White, Billy M. White, Sr. and Billy M. White, Jr. previously did business as BMW Farms and shall be known hereinafter collectively as "BMW Farms."

3

12.   Defendant Pilgrim's Pride Corporation ("Defendant" or "Pilgrim's") is a Delaware corporation with its principal place of business at 1770 Promontory Circle, Greeley, Colorado, 80634.  Defendant is a citizen of Delaware and Colorado.

13.   Defendant may be served on its registered agent, Corporation Service Company, 40 Technology Pkwy South, #300, Norcross, Georgia, 30092.

14.   The Defendant is subject to personal jurisdiction in this Court.

15.   This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332 because there is complete diversity of citizenship between the Plaintiffs and Defendant, and the amount in controversy, exclusive of costs and interest, exceeds $75,000.00. Additionally, this Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 because it involves a federal question under 7 U.S.C. § 209.

16.   Venue is proper in this judicial district pursuant to 7 U.S.C. § 197b. Additionally, venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) since a substantial part of the events giving rise to the claims occurred in the Middle District of Georgia, Athens Division.  Venue is proper in this division pursuant to Local Rule 3.4 because all the Plaintiffs reside in a county served by this division.

## FACTUAL BACKGROUND

### *Pilgrim's Broiler Operations at Its Athens Complex*

17.    The production of broilers—young chickens bred for meat— in the United States is almost entirely controlled by vertically integrated poultry companies who own the birds throughout their life cycle—from hatching through slaughter and processing ("Integrators").

18.    According to the USDA, in 2016, Georgia was largest broiler-producing state, producing over 8 billion pounds of live weight broilers out of the 54.2 billion pounds of live weight broilers produced nationwide.

19.    Pilgrim's, an Integrator, claims to be the second-largest chicken producer in the world, with reported adjusted EBITDA[1] of $1.39 billion (12.9% margin) in 2017 and $1.03 billion adjusted EBITDA (10.4% margin) in 2016.

20.    Integrators, such as Pilgrim's, control virtually every aspect of broiler production, except the Integrators do not raise the birds themselves.

21.    Under Pilgrim's standard contractual arrangement, Pilgrim's provides (including logistics to and from the farms) the chicks, the feed, the medicine,

---

[1]  "EBITDA" stands for earnings before interest, taxes, depreciation and amortization.

chicken catching services, veterinary services, and other technical services and supervision.

22. Pilgrim's operates two (2) hatcheries, a feed mill, and a chicken processing plant in and around Athens, Georgia (collectively, the "Athens Complex"), much of which was built in the 1970s or before.

23. According to records Pilgrim's provided to USDA, approximately 391,112,492 pounds of live chicken were delivered to the Athens Complex in 2016 for processing from approximately 115 farms.

24. Under the standard broiler industry practice, poultry growers, which are predominately small, family-owned operations, typically provide poultry housing, utilities, labor and care necessary to raise the broilers (the "Grow-out Services").

25. Notably, Integrators provide no capital for the poultry houses ("Grow-out Houses"), although Integrators often require that Grow-out Houses be built and/or maintained to an Integrators' precise and sometimes onerous specifications.

26. As a general matter, Grow-out Houses have almost no value outside of broiler production.

27.   Due to the large investment by a Grower (defined below) in building, maintaining, and upgrading the Grow-out Houses according to their Integrator's specific directives, the Grower is forced to continue to contract with the Integrator for subsequent flocks (subject to the Integrator's whim) or risk financial ruin.

28.   Pilgrim's contracted with each of the Plaintiffs to provide Grow-out Services to Pilgrim's for its Athens Complex.

29.   A Pilgrim's Grower's base pay rate is based on whether their Grow-out Houses are classified by Pilgrim's as "unimproved/conventional," "improved," "Class AA," or "Class AAA".

30.   Typically, a Grow-out Service provider (a "Grower") for the Athens Complex houses the flocks for 38 to 42 days.

31.   Pilgrim's Growers, including Plaintiffs, are compensated, in part, using a competitive pay scheme that is used, in some variation, extensively throughout the broiler industry and is commonly referred to as the "Tournament System".

32.   For raising broilers, Pilgrim's sets an average price per pound – known to Pilgrim's Growers as "Base Pay" – based on the type of Grow-out Houses the Grower uses.

33. For each flock sold, some Growers will get more than the Base Pay, and others less, depending on the Grower's performance relative to other Growers.  For Pilgrim's, this relative performance is measured using a formula that takes into account feed conversion efficiency (i.e., how much weight the chickens gained, compared to how much feed Pilgrim's supplies) and chick quality and mortality.

34. Every week, the Growers who had flocks processed that week are ranked. Growers who exceed the average performance for flocks processed that week receive a premium above the Base Pay.  Growers who fall below the average performance for flocks processed that week are paid at a discount from the Base Pay.  After their flocks are processed, a Grower receives a settlement sheet which shows the Grower's performance in relative terms to the other Growers who had flocks processed that week.

35. Another key component in determining how much Growers are paid for their flock is how many chicks they receive.  The calculation of how many square feet per bird is sometimes called "Bird Density."  As Bird Density decreases (i.e., square feet per bird increases), the number of pounds the Grower can deliver back to Pilgrim's when the broilers are ready to be caught necessarily reduces, lowering the gross pay the Grower receives.

8

36.     In late 2016, according to information provided to the USDA, Pilgrim's lowered its target Bird Density for all types of Grow-out Houses serving the Athens Complex from .72 square foot per bird to .75 square foot per bird.

37.     A Grower's costs, including for cooling or heating, would have largely been the same whether growing a flock with a Bird Density of .72 square foot per bird or a Bird Density of .75 square foot per bird.

38.     In the past, when Pilgrim's reduced Bird Density, Pilgrim's increased pay per pound.   For example, around August 2008, due to increased feed ingredient costs, Pilgrim's reduced Bird Density in "improved" housing from .71 square foot per bird to .75 square foot per bird and increased the pay per pound by $0.031 cents.  In the attached August 2008 memorandum to Growers, which is attached hereto as Exhibit "A", Pilgrim's explained: "The Pilgrim's Pride management team recognizes that reducing placement results in additional time without birds and less marketable pounds placed in broiler houses on an annual basis."

39.     However, there was no corresponding increase in pay for Plaintiffs for this 2016 lowering of Bird Density.

40.   Pilgrim's has represented that this late 2016 reduction in Bird Density was to reduce the number of days between flocks ("Downtime"), which, according to Pilgrim's, had grown longer due to an egg and/or chick shortage.

41.   However, despite the decrease in Bird Density, total chicks placed in 2016 with Grow-out Houses serving the Athens Complex was only 0.75% less in 2016 than 2015.

42.   By contrast, between 2014 and 2016, there was an almost 9% increase in square footage in Grow-out Houses that served the Athens Complex.  This new square footage was mostly, if not exclusively, newly constructed Class AAA housing.

43.   Pilgrim's first began offering the Class AAA contract in May of 2014.

44.   According to Pilgrim's broiler manager, in June 2017, Pilgrim's added 81 new Grow-out Houses, averaging 32,400 square feet each, for the Athens Complex between August 2015 and June 2017; and 34 new Grow-out Houses, averaging 32,400 square feet each, were under construction as of June 2017 that the broiler manager anticipated Pilgrim's would take under contract.

45.   Increased Downtime between flocks can reduce a Grower's total flocks, curtailing the gross pay to Growers such as the Plaintiffs.   Although

10

Plaintiffs experienced increased Downtime, Plaintiffs were not compensated any agreed upon amount based on the Downtime between flocks.

### *Notice of Defendant's Conversion of Its Athens Complex to No Antibiotic Ever*

46.  On or around February 2017 or March 2017, Pilgrim's sent or delivered a letter (the "Initial NAE Notice Letter") substantially in the form of the letter attached hereto as Exhibit "B", which is incorporated herein, to approximately 48 Growers (the "Impacted Growers"),[2] including every Plaintiff, whereby Pilgrim's threatened termination of the then-current broiler production agreement for Impacted Growers who had "unimproved/conventional", "improved" or "Class AA" Grow-out Houses if the Impacted Gowers did not elect by June 30, 2017 to upgrade their Grow-out Houses to "Class AAA" housing.

47.  The Initial NAE Notice Letter notified Impacted Growers that the Athens Complex was transitioning to NAE (No Antibiotics Ever) poultry production and that all non-Class AAA Grow-out Houses serving the Athens Complex had to be phased out or upgraded to Class AAA housing.

---

[2] For purposes of this Complaint, while the terms "Grower" and "Impacted Growers" have distinct meanings, both terms shall generally include Plaintiffs, unless the context demands otherwise.

48.   The Initial NAE Notice Letter notified Impacted Growers that the "Base Pay" for Class AAA housing would be 6.15 cents per pound and that they would be required to sign a new broiler production agreement if the Impacted Growers elected to continue with Pilgrim's after upgrading to Class AAA housing.  An example of the new broiler production agreement was not provided to the Impacted Growers.

49.   After receipt of the Initial NAE Notice Letter, Pilgrim's told Echols that the conversion of the Athens Complex to NAE production had been in the works for over one (1) year, but that plan was not revealed to the Impacted Growers until receipt of the Initial NAE Notice Letter.

50.   In fact, Pilgrim's CEO Bill Lovette told the *Wall Street Journal* in April 2015: "We have a plan, *a very definitive plan,* where by the end of 2018, something over 25% of all our production will be antibiotic-free." (emphasis added).

51.   Yet, despite this "definitive plan" in April 2015, Pilgrim's did not notify the Impacted Growers, including Plaintiffs, about any requirement that they convert their housing to Class AAA until the Initial NAE Notice Letter in February or March 2017.

52.   Nevertheless, during this period between April 2015 and February or March 2017, Pilgrim's continued to require Impacted Growers for the Athens Complex, as a purported requirement to continue to grow, to upgrade their non-Class AAA Grow-out Houses in ways that would not increase the Impacted Grower's Base Pay.

53.   Soon after the Initial NAE Notice Letter was sent or delivered, according to information provided to USDA, Pilgrim's lowered its target Bird Density for "unimproved/conventional," "improved," and "Class AA" Grow-out Houses serving the Athens Complex from .75 square foot per bird to .84 square foot per bird.   Notably, Pilgrim's kept its target Bird Density for Class AAA Grow-out Houses at .75 square foot per bird.

54.   Upon information and belief, this targeting of lower Bird Density for the non-Class AAA housing, with no increase in compensation, was a calculated strategy to discourage Impacted Growers, such as Plaintiffs, from making the upgrades.   Specifically, in addition to eroding the goodwill between Impacted Growers and Pilgrim's, the significant reduction in Bird Density created immediate financial consequences for Impacted Growers such as the Plaintiffs, limiting available capital to make the required upgrades.

55.   A Grower's costs, including for cooling or heating, would have largely been the same whether growing a flock with a Bird Density of .75 square foot per bird or .84 square foot per bird.

56.   Like the late 2016 cut in Bird Density, there was no corresponding increase in pay for Plaintiffs for the 2017 cut in Bird Density.

57.   Even with the reduced Bird Density that occurred prior to and after the Initial NAE Notice Letter, Pilgrim's allowed Plaintiffs to run out of feed (sometimes allowing broilers to go as long as 24 to 26 hours without feed) and would regularly modify pick-up times after the Plaintiffs had begun preparation for catching by moving feed pans.  These actions resulted in bird shrinkage, ultimately lowering Plaintiffs' payments from Pilgrim's.  No additional agreed-upon compensation was paid to Plaintiffs as a result of these business practices of Pilgrim's.

58.   Additionally, Pilgrim's provided lower quality chicks to some, if not all, of the Plaintiffs and prohibited euthanizing chicks during the first seven (7) days after placement, resulting in additional feed consumption by severely sick or injured chicks. There was no corresponding increase in pay per pound to the Plaintiffs as a result of these business practices.

14

### *David Echols' Operations*

59.   Echols, who is 55 years old, owns four (4) tunnel ventilated Grow-out Houses in Madison County, Georgia.

60.   Two (2) of Echols' Grow-out Houses measure 34 feet by 300 feet and are post houses (hereinafter, the "Echols Post Houses").

61.   Echols' two (2) other Grow-out Houses measure 34 feet by 400 feet and 40 feet by 500 feet, respectively (hereinafter, the "Echols Newer Houses").

62.   Echols began growing broilers for Pilgrim's pursuant to a written contract at some point prior to 2013. Broilers grown by Echols in 2013 and prior to April 2015 were sent to Pilgrim's processing facility in Gainesville ("Gainesville Complex"). After April 2015, broilers grown by Echols were sent to Pilgrim's processing facility associated with the Athens Complex.

63.   Near in time to when Echols began growing for the Athens Complex in April 2015, Echols signed a written broiler production agreement with Pilgrim's, but Echols does not recall (and his records do not reflect) ever receiving a copy signed by Pilgrim's in return. Echols believes he executed (and perhaps on a subsequent occasion prior to February 2017) a broiler production agreement substantially in the form of Exhibit "C" (the "2013 Form Broiler Production Agreement"), which is attached hereto and bears a

15

template revision date of October 2013, or another form of broiler production agreement containing provisions related to Termination, Responsibilities of the Company, and Responsibilities of Company and the Independent Grower similar to the ones contained in the 2013 Form Broiler Production Agreement (collectively, "Pre-2017 Form Broiler Production Agreement").

64. Under the Pre-2017 Form of Broiler Production Agreement, Pilgrim's considered all four (4) of Echols' Grow-out Houses to be "improved" for purposes of establishing his Base Pay.

65. Echols was an above-average Grower for Pilgrim's at its Athens Complex under its Tournament System. For the ten (10) flocks preceding his receipt of the Initial NAE Notice Letter, Echols was in the top 50% of Pilgrim's Growers for 60% of those flocks. Only once in those ten (10) flocks did Echols fall in the bottom 30% of Athens Complex's Growers.

66. Additionally, Echols regularly outperformed other Pilgrim's Growers who had Class AAA Grow-out Houses under the Athens Complex's Tournament System. For example, for his last flock in 2016, Echols was the top performing Pilgrim's Grower for the Athens Complex for the week ending

16

November 20, 2016, beating out ten (10) Growers with Class AAA Grow-out Houses.

67.    In 2014, Pilgrim's requested that Echols upgrade the lighting system in each of his four (4) Grow-out Houses with three rows of lights and a maximum of 20 feet spacing.

68.    In 2015, Echols purchased over $4,000 in supplies necessary to install the lighting system and he and his helper spent at least 40 hours installing the modified lighting system.

69.    In or around July 2015, Echols financed a John Deere 3039R, a 38-horse power tractor with a purchase price in excess of $20,000, to use primarily inside his four (4) Grow-out Houses.

70.    In 2016, at the direction of Pilgrim's, Echols purchased over $12,000 in supplies for a new heating system for all four (4) Grow-out Houses.

71.    In December 2016, an electrical service provider and Echols and his helper spent over 40 hours installing new heating equipment for all four (4) Grow-out Houses.

72.    Additionally, Echols did not take a flock for over forty (40) days in November and December 2016 to allow sufficient Downtime for these upgrades.

73.  Prior to February 2017, Echols paid a combined amount of at least $12,500 per Grow-out House for additional capital investments over the life of his and/or his family's poultry growing arrangement with Pilgrim's, or their predecessor company.

74.  Echols continued to invest in his four (4) Grow-out Houses and equipment needed to operate the Grow-out Houses in anticipation that he would continue to grow broilers for Pilgrim's for years to come.

75.  In February 2017, while chicks were in his four (4) Grow-out Houses, Echols signed a new broiler production agreement, a copy of which is attached hereto as Exhibit "D" and incorporated herein (the "Echols 2017 Agreement").

76.  When compared to the Pre-2017 Form Broiler Production Agreement, the Echols 2017 Agreement, which appears to be the same as the 2016 Form Broiler Production Agreement (defined below), changed the termination provision and purported to compel Growers to waive additional substantive rights, including rights related to bringing class actions.

77.  A Pilgrim's employee waited for Echols' signature on the Echols 2017 Agreement at the Echols' Farm, indicating Echols would not get additional chicks if he did not sign.

78.    The Echols 2017 Agreement was not signed by Pilgrim's until March 6, 2017, at which time chicks were already placed in all four (4) of Echols Grow-out Houses.

79.    The Initial NAE Notice Letter does not make reference to a specific effective date of the broiler production agreement in effect between Echols and Pilgrim's.

80.    While not mentioned in the Initial NAE Notice Letter, Echols was told by a Pilgrim's employee that the Echols Post Houses had to be retired and were not eligible to upgrade to Class AAA housing.

81.    Echols investigated the costs that would be required to upgrade Echols Newer Houses to Class AAA housing and concluded it would cost in excess of $20,000 per structure to convert the Echols Newer Houses to Class AAA housing.

82.    The Pilgrim's field services representative discouraged Echols from upgrading Echols Newer Houses to Class AAA housing.

83.    While Echols never received a written contract for Class AAA housing and the Initial NAE Notice Letter did not address Bird Density, Echols was told by a Pilgrim's employee that Bird Density was going to be reduced to .87 square foot per bird for NAE production.

19

84. After receipt of the Initial NAE Notice Letter, Pilgrim's delivered only two (2) additional flocks to Echols: one (1) on or around May 12, 2017 (the "May Echols Flock") and one (1) on or around July 14, 2017 (the "July Echols Flock").

85. Pilgrim's decreased Echols' placement of birds approximately 7% and 14.5% for the May Echols Flock and July Echols Flock, respectively, from his historical averages at the Athens complex with no corresponding increase in pay per pound.

86. The reduction in Bird Density alone in 2016 and 2017 cost Echols no less than $6,649.81.

87. Echols went 31 days without birds in April and May 2017 and 23 days in June and July 2017.  By comparison, in 2015 and much of 2016, Echols was usually only without a flock for 10-19 days while working with the Athens Complex.  Echols did not receive any agreed-upon additional compensation for this increase in Downtime.

88. On September 4, 2017, approximately 12 days after the July Echols Flock was processed, Pilgrim's sent the Notice of Termination, attached hereto as Exhibit "E" and incorporated herein by reference, wherein Pilgrim's claimed it was "terminating the above-referenced Agreement due to new housing

20

specifications being implemented in the Athens Complex to meet the requirements of NAE production."

89.   Since Pilgrim's made no commitments to increase Bird Density or pay as a result of lower Bird Density for flocks delivered between the Notice of Termination date and the anticipated agreement termination date of December 31, 2017, and in light of the anticipated agreement termination date itself and the increased variable costs associated with the winter heating season, Echols notified Pilgrim's on September 26, 2017 not to deliver additional birds.

90.   Pilgrim's never offered to allow Echols to return to the Gainesville Complex, despite the Gainesville Complex continuing to place chicks with Growers who only had "improved" housing.

91.   Echols sought unsuccessfully to find another Integrator in the area so that he could continue to use his Grow-out Houses.

### *Stanley Dove's Operations*

92.   Stanley Dove, who is 66 years old, owns four (4) tunnel ventilated Grow-out Houses that are approximately 13,600 square feet each in Madison County, Georgia.

93.   Stanley Dove began growing broilers for Pilgrim's predecessor entities in 1989 and for Pilgrim's pursuant to a written contract after Pilgrim's acquired ConAgra in or around 2003.

94.   Pilgrim's considered all of Stanley Dove's Grow-out Houses to be "improved" for purposes of establishing his Base Pay.

95.   For the ten (10) flocks preceding his receipt of the Initial NAE Notice letter, Stanley Dove was in the top 50% of the Athens Complex's Growers for 50% of those flocks under Pilgrim's Tournament System.

96.   In fact, between January 2017 and May 2017, Stanley Dove was the No. 2 ranked Grower overall for the Athens Complex.

97.   Stanley Dove regularly outperformed other Growers who had Class AAA Grow-out Houses under the Athens Complex's Tournament System.   For example, for his first flock in 2017, Stanley was the highest performing Grower for the week ending April 2, 2017, beating out nine (9) Growers with Class AAA Grow-out Houses.

98.   Prior to February 2017, Stanley Dove paid a combined amount of at least $12,500 per Grow-out House for additional capital investments over the life of his poultry growing arrangement with Pilgrim's, including for solid side walls between 2007 and 2009.

99.    In 2015 or 2016, Stanley Dove purchased and installed new fans to improve production in his Grow-out Houses.

100.   As of April 2017, Stanley Dove still owed money on equipment usable only in his Grow-out Houses.

101.   In the years leading up to the Initial NAE Notice Letter, Stanley Dove continued to invest in his four (4) broiler Grow-out Houses and equipment needed to operate his Grow-out Houses in anticipation that he would continue to grow broilers for Pilgrim's for years to come.

102.   Over the years, Stanley Dove signed numerous written broiler production agreements with Pilgrim's, but Stanley Dove (with the exception of the Stanley Dove 2017 Agreement (defined below)) never received a fully executed copy signed by Pilgrim's in return.  Stanley Dove believes he executed (and perhaps on a subsequent occasion prior to February 2017) a broiler production agreement substantially in the form the "2013 Form Broiler Production Agreement," or another form of broiler production agreement containing provisions related to Termination, Responsibilities of the Company, and Responsibilities of Company and the Independent Grower similar to the ones contained in the 2013 Form Broiler Production

Agreement (defined above, collectively as the "Pre-2017 Form Broiler Production Agreement").

103. In May 2017, while chicks were in his four (4) Grow-out Houses, Stanley Dove signed a new broiler production agreement, a copy of which is attached hereto as Exhibit "F" and incorporated herein (the "Stanley Dove 2017 Agreement").

104. When compared to the Pre-2017 Form Broiler Production Agreement, the Stanley Dove 2017 Agreement, which appears to be the same as the 2016 Form Broiler Production Agreement (defined below), changed the termination provision and purported to compel Growers to waive additional substantive rights, including rights related to bringing class actions.

105. A Pilgrim's employee pressured Stanley Dove to sign the Stanley Dove 2017 Agreement, suggesting he would not continue to get birds if he did not sign it even though he had another contract in place.

106. This Stanley Dove 2017 Agreement was not counter-signed by Pilgrim's until May 31, 2017, at which time chicks were already placed in Stanley Dove's Grow-out Houses.

107.   The Initial NAE Notice Letter does not make reference to a specific date of the broiler production agreement in effect between Stanley Dove and Pilgrim's.

108.   Dove investigated the costs that would be required to upgrade his houses to Class AAA housing and concluded it would cost $75,000 in materials and an additional $50,000 in labor to convert his four (4) houses to Class AAA housing.

109.   Pilgrim's field representative Sean Holland discouraged Stanley Dove from making the upgrades.

110.   While Stanley Dove never received a written contract for Class AAA housing and the Initial NAE Notice Letter did not address Bird Density, Stanley Dove was told via text message from Sean Holland on February 28, 2017 that Bird Density was going to be moved to .78 square foot per bird for NAE production and pay would be $0.0685 or $0.0695 per pound for NAE production.

111.   Holland's representation regarding increase in pay per pound for NAE production contradicts the pay increase set forth in the Initial NAE Notice Letter and information that Pilgrim's has since provided to USDA.

112.  Dove was hesitant to make the required upgrades because, among other reasons, he was unwilling to go further into debt and/or the costs of the upgrades would impair his ability to ultimately retire.

113.  After Stanley Dove told Pilgrim's he did not intend to make the upgrades in response to the Initial NAE Notice Letter, Pilgrim's delivered one (1) additional flock to Stanley Dove on or about August 29, 2017 (the "August Dove Flock").

114.  Pilgrim's decreased Dove's placement of birds (which reduced Bird Density) approximately 14.3% for the August Dove Flock from Stanley Dove's historical averages at the Athens Complex, with no corresponding increase in pay per pound.

115.  The reduction in Bird Density alone in 2016 and 2017 cost Stanley Dove no less than $6,399.43.

116.  Beginning with the April 2017 flock, the Downtime increased to 26, 25, and 22 days, respectively, for the last three (3) flocks Dove received. By comparison, for most of 2015 and much of 2016, Dove was usually only without a flock for 9 to17 days while working with the Athens Complex.

117.  Dove does not recall ever receiving a notice of termination from Pilgrim's, but on October 19, 2017, Stanley Dove asked Pilgrim's not to deliver any

more chicks because of Pilgrim's unfair practices and in anticipation of the December 31, 2017 deadline set by Pilgrim's related to the termination of the parties' relationship.

118.   Specifically, as of October 19, 2017, Pilgrim's had made no commitments to increase Bird Density or pay as a result of lower Bird Density for flocks delivered before the termination date Pilgrim's set out in the Initial NAE Notice Letter. Additionally, Pilgrim's, in some occasions, had failed to deliver feed on time, resulting in birds going hours (as much as 16 to 18 hours) without feed (which impacted Dove's pay). Further, based on the time of year, Dove faced increased variable costs associated with the winter heating season for any low Bird Density flocks placed between October 2017 and December 31, 2017, the purported termination date.

119.   Pilgrim's never offered to allow Stanley Dove to grow for the nearby Gainesville Complex, despite the Gainesville Complex continuing to place chicks with Growers who only had "improved" housing.

120.   Dove sought unsuccessfully to find another Integrator in the area so that he could continue to use his Grow-out Houses.

*Alex Mathews' Operations*

121. Mathews, who is 48 years old, owns three (3) Grow-out Houses in Oglethorpe County, Georgia that contain approximately 16,000 square feet each.

122. Mathews began growing broilers for Pilgrim's predecessor entities in 1989 and for Pilgrim's pursuant to a written contract after Pilgrim's acquired ConAgra in or around 2003.

123. Pilgrim's considered all of Mathews' Grow-out Houses to be "improved" for purposes of establishing his Base Pay.

124. Mathews regularly outperformed other Growers who had Class AAA Grow-out Houses under the Athens Complex's Tournament System.  For example, for his last flock in 2016, Mathews was the third highest performing Grower for the week ending November 13, 2016, beating out seven (7) Growers with Class AAA Grow-out Houses.

125. Prior to February 2017, Mathews paid a combined amount of at least $12,500 per Grow-out House for additional capital investments over the life of his poultry growing arrangement with Pilgrim's, including enclosing and insulating his three (3) Grow-out Houses in or around 2010.

126.   Additionally, at the direction of Pilgrim's, in 2014 and 2015, Mathews, at his sole cost, purchased and had installed new lighting components in his Grow-out Houses at a total cost of approximately $3,000 in materials, and approximately $2,250 in outside labor.

127.   Also, at the direction of Pilgrim's, in 2015 and 2016, Mathews, at his sole cost, purchased and had installed five (5) new "butterfly fans" in his Grow-out Houses at a total cost of over $4,200 in materials, and over $600 in outside labor.

128.   In the years leading up to the Initial NAE Notice Letter, Alex Mathews continued to invest in his three (3) Grow-out Houses and equipment needed to operate the Grow-out Houses in anticipation that he would continue to grow broilers for Pilgrim's for years to come so as to, among other things, save for retirement.

129.   Mathews signed a written broiler production agreement with Pilgrim's, but does not recall (and his records do not reflect) ever receiving a copy signed by Pilgrim's in return.  Mathews believes he likely executed one or more broiler production agreements substantially in the form of Exhibit "G" (the "2016 Form Broiler Production Agreement"), which is attached hereto and bears a template revision date of September 2016, the 2013 Form Broiler

29

Production Agreement, or another form of broiler production agreement containing provisions related to Termination, Responsibilities of the Company, and Responsibilities of Company and the Independent Grower similar to the ones contained in the 2016 Form Broiler Production Agreement or the 2013 Form Broiler Production Agreement.

130.   The Initial NAE Notice Letter does not make reference to a specific date of the broiler production agreement in effect between Mathews and Pilgrim's, so it remains possible that Mathews signed the 2016 Form Broiler Production Agreement while chicks were in Mathews' Grow-out Houses.

131.   Mathews investigated the costs that would be required to upgrade his Grow-out Houses to Class AAA housing and concluded it would cost between $200,000 and $250,000 to convert his three (3) Grow-out Houses to Class AAA housing.

132.   A Pilgrim's employee named Trey told Mathews that he did not blame Mathews for not making the upgrades.

133.   In the two (2) flocks delivered to Mathews after Pilgrim's sent the Initial NAE Notice Letter, Pilgrim's cut chick placement (and thus Bird Density) from Mathews' historical averages with the Athens complex by 14.4% for

the flock delivered on April 7, 2017 (the "April Mathews Flock") and 10.3% for the flock delivered on June 6, 2017 (the "June Mathews Flock").

134.   Pilgrim's made no corresponding increase in pay per pound to Mathews for the decrease in Bird Density, including in relation to the April Mathews Flock or June Mathews Flock.

135.   The reduction in Bird Density alone in 2016 and 2017 cost Mathews no less than $6,077.08.

136.   Mathews' Downtime increased to 20 to 28 days for the last five (5) flocks Mathews received. By comparison, in 2015, Mathews was usually only without a flock for 7 to 16 days while working with the Athens Complex.

137.   After deciding that he was unwilling to go back into debt to make the upgrades to his Grow-out Houses necessary to be considered Class AAA housing, Mathews began applying for jobs.

138.   After receiving an offer to begin working at a Wal-Mart distribution center (albeit at substantially lower pay) and in light of Pilgrim's reduced Bird Density (with no pay increase commitment), increased Downtime, and looming deadline to make upgrades, Mathews communicated to Pilgrim's in July or August 2017 not to place another flock after the June Mathews Flock was processed on July 17, 2017.

139.   Mathews promptly began new employment with Wal-Mart.

140.   Mathews placed his farm on the market, but as of now, he has received no offers to purchase his farm.

141.   Pilgrim's never offered to allow Mathews to grow for the nearby Gainesville Complex, despite the Gainesville Complex continuing to place chicks with Growers who only had "improved" housing.

142.   Mathews sought unsuccessfully to find another Integrator in the area so that he could continue to use his Grow-out Houses.

### *Trinity Farm Operations*

143.   James W. Dove, who is 81 years old, and Teresa K Dove, who is 55 years old, own two (2) tunnel ventilated Grow-out Houses which are 14,400 square feet each. James W. and Teresa K. Dove did business with Pilgrim's as Trinity Farm.

144.   Trinity Farm began growing broilers for Pilgrim's predecessor entities in or around 1990 and for Pilgrim's pursuant to a written contract after Pilgrim's acquired certain assets of ConAgra in or around 2003.

145.   Pilgrim's considered all of Trinity Farm's Grow-out Houses to be "improved" for purposes of establishing its Base Pay.

146.   Trinity Farm regularly outperformed other Growers who had Class AAA Grow-out Houses under the Athens Complex's Tournament System.  For example, for the last flock Trinity Farm's grew for Pilgrim's, Trinity Farm was the second highest performing Grower for the week ending February 4, 2018, beating out eight (8) Growers, most of which had Class AAA Grow-out Houses.

147.   Prior to February 2017, Trinity Farm paid a combined amount of at least $12,500 per Grow-out House for additional capital investments over the life of its poultry growing arrangement with Pilgrim's.

148.   For example, in 2014, Pilgrim's requested that Trinity Farm upgrade the lighting system in each of its Grow-out Houses with three rows of lights and a maximum of 20 feet spacing.

149.   In 2014, Trinity Farm purchased the required supplies necessary to install the lighting system.

150.   In 2014 or 2015, Trinity Farm purchased and had installed three (3) new "butterfly fans" in each Grow-out House.

151.   In the years leading up to the Initial NAE Notice Letter, Trinity Farm continued to invest in its two (2) Grow-out Houses and equipment needed to

operate its Grow-out Houses in anticipation that Trinity Farm would continue to grow broilers for Pilgrim's for years to come.

152. Over the years, Trinity Farm signed numerous written broiler production agreements with Pilgrim's, but it never received a fully executed copy signed by Pilgrim's in return. James W. Dove and Teresa K. Dove believe they likely executed (and perhaps on a subsequent occasion prior to February 2017) a broiler production agreement substantially in the form the "2013 Form Broiler Production Agreement," or another form of broiler production agreement containing provisions related to Termination, Responsibilities of the Company, and Responsibilities of Company and the Independent Grower similar to the ones contained in the 2013 Form Broiler Production Agreement.

153. The Initial NAE Notice Letter does not make reference to a specific date of the broiler production agreement in effect between Trinity Farm and Pilgrim's, so it remains probable Trinity Farm signed the 2016 Form Broiler Production Agreement while chicks were in Trinity Farm's Grow-out Houses.

154. James W. Dove and Teresa K. Dove investigated the costs that would be required to upgrade their Grow-out Houses to Class AAA housing and

34

concluded they were unwilling to go back into debt to make the demanded upgrades.

155.   After Trinity Farm received the Initial NAE Notice Letter, Pilgrim's delivered five (5) additional flocks to Trinity Farm.

156.   For four (4) of the five (5) flocks, Pilgrim's decreased Trinity Farm's chick placement (and thus Bird Density) approximately 14.5% to 15% from its historical averages at the Athens Complex. For the flock delivered June 13, 2017, Pilgrim's decreased Trinity Farm's placement of birds by approximately 4% from its historical averages at the Athens complex. There was no corresponding increase in pay per pound to Trinity Farm for these significant decreases in Bird Density.

157.   The reduction in Bird Density alone in 2016 and 2017 cost Trinity Farm no less than $8,306.14.

158.   Beginning with the flock delivered in April 2017, the Downtime increased to 30, 21, 24, 19, and 29 days, respectively, for the last five (5) flocks Trinity Farm received. By comparison, for most of 2015 and much of 2016, Trinity Farm was usually only without a flock for 6 to 15 days while working with the Athens Complex.

159.  James W. Dove and Teresa K. Dove continued raising birds through the end of 2017, having its last flock processed in February 2018.

160.  Trinity Farm was not delivered any more chicks after the flock processed in February 2018.

161.  For its last flock, which was apparently marketed as NAE, Trinity Farm ranked No. 2 out of 10 Athens Complex's Growers, beating out numerous Growers with Class AAA housing.

162.  Pilgrim's never offered to allow Trinity Farm to grow for the nearby Gainesville Complex, despite the Gainesville Complex continuing to place chicks with Growers who only had "improved" housing.

163.  Trinity Farm sought unsuccessfully to find an Integration willing to place pullets in its Grow-out Houses.

### *BMW Farms' Operations*

164.  Sandra K. White, who is 61 years old, Billy M. White, Sr. (also known as Mike White), who is 62 years old, and Billy M. White, Jr. (also known as Michael White) purchased approximately 62 acres in Oglethorpe County, Georgia (the "Comer Farm") in 2007, upon which 11 tunnel ventilated grow houses were and still are located. The Whites did business with Pilgrim's as BMW Farms.

36

165.  Soon after purchasing the Comer Farm, at the direction of Pilgrim's, BMW Farms invested nearly $175,000 to upgrade the 11 Grow-Out Houses.

166.  BMW Farms began growing broilers for Pilgrim's, under its Goldkist's unit, in 2007 pursuant to one or more written contracts.

167.  In June of 2012, Sandra K. White and Billy M. White, Sr. borrowed $1,500,000 to refinance the loan used to originally purchase the Comer Farm.

168.  At some point in the spring of 2014, Pilgrim's notified BMW Farms they would no longer place flocks in three (3) of their older Grow-out Houses because BMW Farms was unwilling to make the Pilgrim's-requested upgrades for these three (3) Grow-out Houses.

169.  In 2014, BMW Farms made the Pilgrim's-demanded updates for the remaining eight (8) Grow-out Houses, which were built between 1995 and 1999 and contained 20,000 square feet each.

170.  After the reduction of Grow-out Houses in 2014, Pilgrim's considered two (2) of BMW Farms' remaining eight (8) broiler Grow-out Houses to be "Class AA" and BMW Farms' remaining six (6) Grow-out Houses to be "Improved".

171. In connection with Pilgrim's reduction of BMW Farms' number of Grow-out Houses in use, upon information and belief, BMW Farms executed a new broiler production agreement in or around May or June 2014. None of the Whites, however, recall receiving a fully executed copy of the broiler production agreement back from Pilgrim's.

172. Except with modifications for pay per pound and Bird Density specific to BMW Farms, BMW Farms believes it executed in May or June 2014 (and perhaps on a subsequent occasion prior to February 2017) a broiler production agreement substantially in the form of the "2013 Form Broiler Production Agreement" or another form of broiler production agreement containing provisions related to Termination, Responsibilities of the Company, and Responsibilities of Company and the Independent Grower similar to the ones contained in the 2013 Form Broiler Production Agreement or 2016 Form Broiler Production Agreement.

173. Pilgrim's considered all of BMW Farms' Grow-out Houses to be "Class IAAB"[3] for purposes of establishing its Base Pay, which was a blended rate of 0.0533 per pound.

_____

[3] Upon information and belief, this designation was made because some of BMW Farms houses were classified as "improved" and some as "Class AA."

174. Prior to February 2017, BMW Farms paid a combined amount of in excess of $15,000 per Grow-out House for additional capital investments over the life of their poultry growing arrangement with Pilgrim's.

175. For example, in August 2013, Pilgrim's required BMW Farms to upgrade its feeder system, resulting in an expenditure of $26,307.10 in materials alone.

176. Additionally, in July 2014, Pilgrim's required BMW Farms to install 480 LED bulbs at a cost of $5,712.00.  Pilgrim's also sold the bulbs to BMW Farms, requiring BMW Farms to pay Pilgrim's $971.04 per flock for six (6) flocks.  Around the same time, a similar amount of money was spent for the purchase and installation, from third parties, of light dimmers.

177. At the time of the Initial NAE Notice Letter, Sandra K. White and Billy M. White, Sr. still owed in excess of $1,100,000 on the note related to the purchase of the Comer Farm, where BMW Farms' Grow-out Houses were located.

178. In the years leading up to the Initial NAE Notice Letter, the Whites continued to invest in the eight (8) Grow-out Houses and equipment needed to operate the Grow-out Houses in anticipation that BMW Farms would continue to grow broilers for Pilgrim's for years to come, or at least as long

as necessary to pay off the debt related to the Comer Farm, which was not set to mature completely until 2024 under the 2012 note.

179.  The Initial NAE Notice Letter provided: "If additional time is needed regarding the dates/deadlines mentioned above, please contact one of us to discuss the matter prior to the" June 30, 2017 deadline to make an election, as set forth in the Initial NAE Notice Letter.   The Initial NAE Notice Letter was signed by Josh Aaron and Ashley Hall.

180.  After receipt of the Initial NAE Notice Letter, Michael White spoke to Josh Aaron, Pilgrim's Broiler Manager for the Athens Complex, regarding the need for additional time.

181.  During this conference, Aaron and Michael White reached an agreement that BMW Farms would upgrade six (6) of the Grow-out Houses to Class AAA housing by the end of 2017 and would upgrade the remaining two (2) Grow-out Houses to Class AAA housing within a year (but not by the upgrade completion deadline of December 31, 2017).   Under this agreement, there was to be no interruption in chick placement.

182.  Additionally, sometime after BMW Farms' receipt of the Initial NAE Notice Letter, Josh Aaron told Michael White that the Athens Complex had anticipated that only 30% of the approximately 48 Impacted Growers would

make the upgrades to Class AAA, but that 70% had indicated that they intended to make such upgrades. Josh Aaron expressed displeasure and concern about this additional retained volume based on the number of Impacted Growers electing to make the demanded upgrades.

183.   BMW Farms obtained an estimate that it would cost $53,031.44 in materials alone to upgrade to the six (6) Grow-out Houses to Class AAA housing.

184.   Since Plaintiffs Sandra K. White, Billy Michael White, Sr., and Billy Michael White, Jr. did not have the money for the upgrades but feared losing the BMW Farms contract (and thus the Comer Farm) if the upgrades were not made, Michael White convinced his wife to withdraw more than $35,000, pursuant to a hardship waiver, from her 401(k) to loan to BMW Farms in order to make the demanded upgrades.

185.   Over the summer of 2017, in reliance on the above-described agreement with Pilgrim's, BMW Farms began making the required upgrades to convert six (6) of the Grow-out Houses to Class AAA housing by the end of 2017.

186.   Upon information and belief, BMW Farms executed a new broiler production agreement in 2017, substantially in the form as the 2016 Form Broiler Production Agreement, except it contemplated a blended pay rate based on BMW Farms' two (2) existing Class AA Grow-out Houses and

included a specific agreement on Bird Density (hereinafter the "2016 BMW Broiler Production Agreement").  BMW Farms does not have a record of receiving an executed copy of the 2016 BMW Broiler Production Agreement back from Pilgrim's and it, therefore, does not know whether it was fully executed before or only after chicks were placed.

187.   For the flock placed immediately after BMW Farms' receipt of the Initial NAE Notice Letter, which occurred on March 27, 2017 (the "BMW March Flock"), Pilgrim's cut BMW Farms' Bird Density by almost 17.25% over historical norms.  For context, this reduction in Bird Density resulted in $5,000 less for a flock that performed substantially similar to the one produced by BMW Farms in December 2016.

188.   This trend continued for the three (3) subsequent flocks BMW Farms grew for Pilgrim's, with cuts of 12.3% for the flock delivered on June 1, 2017 ("BMW June Flock"), 14% for the flock delivered on August 3, 2017 ("BMW August Flock"), and 16.4% for the flock delivered on October 4, 2017 ("BMW October Flock").

189.   Notably, there was no corresponding increase in pay per pound to BMW Farms for this lowering of Bird Density by Pilgrim's.

190.   The reduction in Bird Density alone in 2016 and 2017 cost BMW Farms no less than $32,621.46.

191.   When BMW Farms requested that Pilgrim's allow it to grow all flocks in seven (7) houses (which would have reduced BMW Farms' expenses), Pilgrim's refused to permit such consolidation.

192.   In addition to the lower Bird Density, Pilgrim's increased BMW Farms' Downtime without increasing compensation.   In 2015, BMW Farms' Downtime ranged from 9 to 16 days.  By contrast, for the last four (4) flocks grown by BMW Farms, BMW Farms' Downtime was 27, 26, 23, and 21 days, respectively.

193.   Pilgrim's would regularly fail to keep sufficient feed for BMW Farms, resulting in flocks going multiple hours (in some cases as long as 25 to 26 hours) without feed, which caused shrinkage of the broilers and lower pay for BMW Farms.

194.   Upon information and belief, BMW Farms' first NAE flock was the BMW August Flock, which was placed in all eight (8) of the Grow-out Houses (though only six (6) Grow-out Houses were in process to be upgraded to Class AAA housing).

195.   In or around September 2017, someone made an offer to purchase the Comer Farm contingent upon confirming Pilgrim's would enter into a broiler production agreement with the purchaser for all eight (8) Grow-out Houses.

196.   On or around October 13, 2017, Pilgrim's notified BMW Farms that it would only agree to place chicks in six (6) Grow-out Houses if the Comer Farm was purchased.

197.   After Pilgrim's refusal to extend a contract offer, the prospective purchaser of the Comer Farm withdrew its interest.

198.   On October 14, 2017, Michael White informed Pilgrim's that BMW Farms intended to continue with the upgrades to Class AAA housing for the remaining two (2) Grow-out Houses once BMW Farms finished its current flock (the BMW October Flock) in all eight (8) Grow-out Houses.

199.   At some point while the BMW October Flock was still at BMW Farms, Pilgrim's informed BMW Farms that Pilgrim's had "written off" the remaining two (2) Grow-out Houses going forward and would not honor its commitment to continue to place chicks in these two (2) Grow-out Houses.

200.   On October 19, 2107, Steven Caudell of Pilgrim's notified BMW Farms that a third-party auditor was going to visit BMW Farms that day to verify the farm's NAE status.   Caudell texted Michael White: "Make sure that any

leftover medications are removed from the farm (med rooms and generator rooms)."

201. Prior to this October 19, 2017 text message from Mr. Caudell, Pilgrim's had not previously instructed BMW Farms to remove antibiotics or to BMW Farms' knowledge, inspected the Comer Farm to confirm antibiotics had been removed.

202. On November 15, 2017, Pilgrim's processed the BMW October Flock. Presumably, the BMW October Flock was sold as NAE chicken, as the Athens Complex became USDA Process Verified for No Antibiotics Ever on November 6, 2017.

203. When Pilgrim's failed to deliver birds by December 5, 2017, BMW Farms instructed Pilgrim's not to deliver additional birds. In light of Pilgrim's reneging on allowing BMW Farms to maintain eight (8) Grow-out Houses and the severe financial impact of (a) the upgrades of the six (6) Grow-out Houses, (b) the drastic reduction in Bird Density, and (c) increased Downtime between flocks, BMW Farms could not begin another winter growing for Pilgrim's under those conditions with just six (6) Grow-out Houses.

204. Pilgrim's never offered to allow BMW Farms to grow for the Gainesville Complex, despite the Gainesville Complex continuing to place chicks with Growers who only had "improved" or Class AA housing.

205. BMW Farms sought unsuccessfully to find another Integrator in the area so that BMW Farms could continue to use its Grow-out Houses but was informed by one Integrator that the waitlist for new Growers contained over 40 names.

### USDA Issues Notice of Violation

206. In March or April 2017, the United States Department of Agriculture (USDA), through its Grain Inspection and Packers and Stockyards Administration (GIPSA), now known as the Fair Trade Practices Program, began investigating Pilgrim's actions related to the requiring of the Impacted Growers to make additional capital investments in order to retain their contracts.

207. On December 17, 2017, USDA's Fair Trade Practices Program issued a Notice of Violation, attached hereto as Exhibit "H" and incorporated herein by reference (hereinafter, "USDA's NOV"), to Pilgrim's related to Pilgrim's requirement of the Impacted Growers to upgrade their Grow-out Houses.

208. USDA's NOV alleged the following violations:

1.  Issuing false or misleading price information to poultry growers and failing to correct said information in violation of the Packers and Stockyards Act ("Act"), 7 U.S.C. 181-229c, and in violation of Regulation 201.53 (9 C.F.R. § 201.53), issued under the Act; and

2.  Requiring additional capital investments in a manner which violates the Act, by the use of coercion and the failure to provide adequate compensation incentives that allow poultry growers to reasonably recoup the cost of your required additional capital investments, in violation of the Act and Regulation 201.216(a), (b), (f) and (h) (9 C.F.R. § 201.216(a), (b), (f) and (h)), issued under the Act.

209.  USDA's NOV requested that Pilgrim's take remedial measures to correct the violations of law.

210.  In its response to USDA's NOV, Pilgrim's, through counsel, refused to take remedial action, but acknowledged the basic factual tenants of its violation of 9 C.F.R. § 201.53 and 9 C.F.R. § 201.216 (and thus 7 USC §§ 192, 209, and/or 228), explaining:

Because raising NAE poultry will require changes to the density of birds placed per house, Pilgrim's has decided to modify the base pay under its AAA contract. This modification of the base pay, as the NOV correctly points out, is not an increase in pay, but merely an adjustment to maintain the status quo of the grower's income previously reflected in the 6.15 base pay initially afforded under the AAA contract.  Indeed, without the adjustment, the growers raising NAE birds would receive less pay than originally indicated in the February 2, 2017 letter.  . . .  As the NOV states, the pay adjustment was made solely to keep growers at the same level of pay that would have been but for the density cuts . . . .

211. In short, Pilgrim's offered in writing only an increase in pay if Plaintiffs upgraded their Grow-out Houses from Improved to Class AAA, but Pilgrim's never offered Plaintiffs in writing the increase it gave Growers with existing Class AAA housing to compensate for the decrease in Bird Density that worsened after the Initial NAE Notice Letter was delivered and was anticipated to continue, at some level, after the full conversion to NAE production for Class AAA housing.

212. The Initial NAE Notice Letter's failure, which remains uncorrected, to offer Plaintiffs an increase for the upgrade to Class AAA housing _and_ an increase for the decrease in Bird Density was false or misleading in contravention of 9 C.F.R. § 201.53, and otherwise in violation of the Packer and Stockyards Act.

213. Stating or implying a lower pay rate discouraged Impacted Growers, including the Plaintiffs, from making the upgrades.

214. The Initial NAE Notice Letter's failure, which remains uncorrected, to offer Plaintiffs an increase for the upgrade to AAA housing _and_ an increase for the decrease in Bird Density amounted to a failure, among other things, to provide adequate compensation incentives that would allow Plaintiffs to reasonably recoup the cost of Pilgrim's required additional capital

48

investments, in contravention of 9 C.F.R. § 201.216, and otherwise in violation of the Packer and Stockyards Act.

215.  Pilgrim's has acknowledged that it could have cost as much as $66,000 to upgrade an "Improved" Grow-out House to Class AAA housing standards.

216.  USDA concluded that it would take approximately 20 years for an Impacted Grower to recoup the $66,000 in additional capital investments, assuming a 0.0615 price per pound (which was initially offered), 96% livability, six (6) flocks per year, no additional upgrades required during such period, and maintenance of the reduced Bird Density that had already begun in the Athens complex.

### *No Antibiotic Ever Poultry Marketing*

217.  According to poultry industry data available in January 2017, by then, supply of NAE poultry was significantly outpacing demand.

218.  Specifically, the main poultry product demanded by NAE customers was, and remains, boneless breast meat. Therefore, in most cases, Integrators must sell the wings, tenders and a portion of the dark meat from cut-up NAE chickens into conventional markets. So, while ABF (a/k/a Antibiotic Free) chickens represented an average of 17.4% of all fresh chicken produced in the United States during the last six months of 2016, only 4.2% of total U.S.

sales during that period were attributable to product marketed and sold as ABF or NAE.  Similarly, during the first ten (10) months of 2017, while 40.5% of all US fresh chicken production was ABF, only 6.4% of total US fresh chicken sales were attributable to product marketed and sold as ABF.

219.   In February 2017, Pilgrim's CEO Bill Lovette explained to investment analysts that Pilgrim's was "ahead of schedule in reaching [its] 25%" NAE goal and acknowledged that Pilgrim's shift to its Antibiotic Free (ABF) production was not market driven but was about "tailoring [ABF] products to specific needs of [Pilgrim's] key customers."   See www.SeekingAlpha.com

220.   Chick-fil-A is the Athens Complex's largest customer, with Chick-fil-A purchasing over 50% of all products processed at the Athens Complex.

221.   Pilgrim's has claimed that conversion of the Athens Complex was compelled because Chick-fil-A began requiring that Pilgrim's provide NAE poultry products.

222.   However, this change was not news to Pilgrim's as Chick-fil-A made a public commitment in 2014 to serve only chicken raised with "No Antibiotics Ever" by December 31, 2019.

223.   Chick-fil-A uses only boneless breast meat.

224. The remainder of the NAE products (i.e., wings, legs, thighs) to be processed at the Athens Complex were to be sold exclusively (or at least primarily) on the conventional market to Zaxby's, KFC, Church's Chicken, or for further processing.

225. Upon information and belief, Pilgrim's contracts with its food service customers, such as Chick-fil-A, tie the contract price to one of the broiler price reporters (i.e, Express Markets, Inc. (AgriStats), Urner Barry, Georgia Dock (now suspended), or Georgia Premium Poultry Price Index). Therefore, upon information and belief, Pilgrim's contracts with its customers, either in price determination or price discovery, take into account the existing and projected supply of NAE poultry when establishing the contract price for NAE poultry products, such as boneless breast meat sold to Chick-fil-A.

226. Pilgrim's has acknowledged that NAE products may become commoditized over time.

227. According to documents provided by Pilgrim's to USDA, there was approximately 11.56 to 12.15 million square feet of Grow-out Houses (including all classifications) in 2017 servicing the Athens Complex.

228. According to documents provided by Pilgrim's to USDA, there was approximately 3.03 million square feet of Grow-out Houses in 2017 classified as "convention/unimproved," "improved," or "Class AA" servicing the Athens Complex.

229. In other words, if all 48 Impacted Growers elected not to make the upgrades, Pilgrim's could reduce the supply of chicken (whether NAE or conventional) produced by the Athens Complex by approximately 25% without even reducing Bird Density or increasing Downtime (steps Pilgrim's also ultimately undertook).

230. Such a 25% reduction in square footage of Grow-out Houses serving the Athens Complex, coupled with an anticipated 15% decrease in Bird Density, alone could result in approximately 141,700,000 fewer pounds of live weight chicken to be processed for the marketplace.

231. Even if Pilgrim's expected 30% of Impacted Growers to make the upgrades as stated by the broiler manager, Pilgrim's could have reduced the supply of chicken (whether NAE or conventional) produced by the Athens Complex by 18% without reducing Bird Density or increasing Downtime (steps Pilgrim's also ultimately undertook).

232.  Such an 18% reduction in square footage of Grow-out Houses serving the Athens Complex, coupled with an anticipated 15% decrease in Bird Density, alone could result in approximately 118,473,000 fewer pounds of live weight chicken to be processed for the marketplace.

233.  Additionally, in Madison County and Oglethorpe County, Pilgrim's created a monopsony or was part of an oligopsony for Grow-out Services generally and certainly for Grow-out Services using Grow-out Houses that were not newly or recently constructed.  In other words, an Impacted Grower (including every Plaintiff), especially older ones, could not readily and easily, if at all, transfer to another Integrator in Madison County or Oglethorpe County.

234.  Therefore, Pilgrim's threatened and actual wrongful termination of Athens Complex's Impacted Growers (including Plaintiffs), reduction in Bird Density, increase in Downtime, allowing flocks to run out of feed for extended periods of times, and inconsistent pick-up times were all aspects of Pilgrim's overall calculated strategy (without regard to the consequences of such actions on Impacted Growers such as the Plaintiffs) to reduce NAE poultry output that would have otherwise been created by conversion of the

Athens Complex and all of its Impacted Growers' square footage capacity to NAE.

235.   Such acts or practices, when the Integrator is a monopsony or part of an oligopsony, will, over time, impact price paid by NAE end-users and creates a likelihood of competitive injury within the NAE poultry market and/or the conventional poultry market.

*Pilgrim's No Antibiotics Ever Poultry Production*

236.   The marketing of poultry products to end consumers as "no antibiotic ever," "NAE," "Antibiotic Free," or "ABF" generally requires verification that the poultry is not (1) administered antibiotics before hatching (in ovo, in the egg) or after hatching, (2) through feed or (3) on the farm at Grow-out Houses.

237.   USDA's Process Verified Program (PVP) is a verification service that offers Integrators a way to market their poultry products using clearly defined, implemented, and transparent process points. An Integrator wishing to make a No Antibiotic Ever marketing claim who successfully completes the PVP verification can use the "USDA Process Verified" shield on its No Antibiotic Ever poultry products.

238.  The PVP verification for NAE does not require a certain type of Grow-out House, or equipment therein, to be used.

239.  The PVP verification for NAE does require conventional and NAE poultry products to be clearly segregated at processing facilities.

240.  As of the date of the Initial NAE Notice Letter, Pilgrim's already had a Canton, Georgia complex and Chattanooga, TN complex that were USDA Process Verified for No Antibiotics Ever.  Upon information and belief, both of these facilities processed broilers raised by Growers who had non-Class AAA housing at the time the Initial NAE Notice Letter was delivered.

241.  The Athens Complex became USDA Process Verified for No Antibiotics Ever on November 6, 2017.

242.  From a production perspective, the main challenges facing producers of NAE poultry relates to intestinal health, specifically to the prevention and control of coccidiosis and necrotic enteritis (NE).

243.  Control and prevention of coccidiosis and NE without antibiotics is primarily driven by feed structure and ingredients, elements that are not within the control of Growers.

244.  There is no published poultry industry literature or data that suggests the upgrades sought by Pilgrim's from Plaintiffs, namely to move from

"improved" to "Class AAA" housing, materially helped the control and prevention of coccidiosis and NE, or any of the other challenges unique to NAE poultry production.

245.    In fact, upon information and belief, Pilgrim's has marketed NAE poultry grown in Grow-out Houses classified as "improved."

<u>COUNT I</u>
<u>BREACH OF CONTRACT – WRONGFUL TERMINATION</u>

246.    Plaintiffs hereby allege and incorporate all the preceding paragraphs as though fully stated herein.

247.    The Echols 2017 Agreement, the Stanley Dove 2017 Agreement, the 2016 Form Broiler Production Agreement and the 2013 Form Broiler Production Agreement each provided those agreements would "continue unless terminated in accordance with the provisions hereinafter contained."

248.    The termination provision of the Echols 2017 Agreement, the Stanley Dove 2017 Agreement, and the 2016 Form Broiler Production Agreement (collectively, the "2016 Broiler Production Agreement")[4] provided in pertinent part:

_____

[4]As explained above, it appears the Echols 2017 Agreement and the Stanley Dove 2017 Agreement are executed copies of the 2016 Form Broiler Production Agreement.

E.   <u>Termination</u>.   Independent Grower shall have the right to terminate this Agreement and its Exhibits without any need for cause provided that written notice is given at least ninety (90) days prior to the termination of this Agreement.  Any such written notice from the Independent Grower shall be given to the Company's Life Production Manager or Broiler Manager.  *Except for cause or economic necessity, the Company will not terminate this Agreement and its Exhibits without first requiring Independent Grower to follow the "Cost Improvement Program" as described in Exhibit B.*  For purposes of this Agreement, "economic necessity" shall be defined to include, but not be limited to, the threat of economic and/or financial harm to the Company, impending bankruptcy and/or disease outbreaks.  The Company will also provide at least ninety (90) days written notice to the Independent Grower prior to the termination of this Agreement. Any such written notice shall be given from the Company to the Independent Grower stating the reason(s) for termination, when the termination is effective, and appeal rights, if any, that the Independent Grower may have with the Company. . . .

2016 Broiler Production Agreement (emphasis added).

249.   To the extent the 2016 Broiler Production Agreement was not operative for certain or all of Plaintiffs because of the absence of an executed copy and/or because of such agreements being voidable under O.C.G.A. § 2-22-2 or other provision of Georgia law at the subject Plaintiff's sole (yet-to-be made) election, the termination provision of the 2013 Form Broiler Production Agreement provided in pertinent part:

Either the Independent Grower or the Company shall have the right to terminate this Agreement and its Exhibits without any need for cause provided that written notice is given at least 90 days prior to the termination of this Agreement.  Any such written notice from the Independent Grower shall be given to the Live Production Manager or

57

Broiler Manager. Any such written notice shall be given from the Company to the Independent Grower stating the reason(s) for termination, when the termination is effective, and appeal rights, if any, that the Independent Grower may have with the company. Termination during a flock shall be in accordance with the other terms of this Agreement. Should such termination occur, the Company agrees to pay the Independent Grower for all services performed in accordance with this Agreement until termination of this Agreement, and the Independent Grower agrees to perform all obligations until termination of this Agreement. *Except for cause or economic necessity, Company will not terminate this Agreement without first requiring Independent Grower to follow the "Cost Improvement Program" as described in Exhibit B.*

2013 Form Broiler Production Agreement (emphasis added).

250. None of Plaintiffs, whether operating under the 2016 Broiler Production Agreement, the 2013 Form Broiler Production Agreements, or a similar agreement (collectively, a "BPA") were terminated for failing to follow a cost improvement program.

251. None of Plaintiffs' BPAs with Pilgrim's were terminated for cause.

252. If Pilgrim's contended that Plaintiffs breached their respective BPAs, Pilgrim's would have been required to provide notice to the Plaintiffs in compliance with 9 C.F.R. § 201.217.

253. Pilgrim's never provided notice to any of the Plaintiffs of an alleged breach of their respective BPAs as required by or in compliance with 9 C.F.R. § 201.217.

58

254. Termination of Plaintiffs' respective BPAs was not due to "economic necessity" because, among other reasons:

    a.    The BPAs, individually and collectively, represented a portion of Pilgrim's overall business and profitability that was not sufficiently material to arise to the level of "economic necessity."

    b.    The marketplace was not demanding more NAE poultry at sufficient levels or margins, if at all, to arise to the level of "economic necessity."

    c.    Any perceived "economic necessity" to reduce poultry supply (NAE or conventional) or production square footage was created by Pilgrim's negligent mismanagement of production capacity of the Athens Complex and related Grow-out Houses in a way that created such a necessity. Therefore, under the BPAs, including the implied duty of good faith and fair dealing, Pilgrim's could not have created a basis for its early termination – i.e., "economic necessity" – through its own wrongful acts or omissions.

    d.    The Plaintiffs' existing Grow-out Houses were sufficient for NAE poultry production.

e.      Pilgrim's could have transferred Plaintiffs to its other complexes where Class AAA housing was not being required.

255.    The BPAs failed to comply 9 C.F.R. § 201.100(c), including by failing to "clearly specify . . . the . . . conditions for the termination of the contract by each of the parties."

256.    Pursuant to 9 C.F.R. § 201.100(h)(1), Pilgrim's was required to give written notice for "the reason(s) for termination" of the Plaintiffs' broiler production agreement at least 90 days prior to the termination of the poultry growing arrangement.  To the extent it complied with 9 C.F.R. § 201.100(h)(1), Pilgrim's did not cite "for cause," "economic necessity" or a cost improvement program in any communication leading up to Pilgrim's purported termination of the BPAs.

257.    Therefore, in breach of Plaintiffs' respective BPAs and the implied duty of good faith and fair dealing related to the termination provisions, Pilgrim's wrongfully terminated the BPAs or wrongfully induced termination of the BPAs because of a strategic scheme to mislead Impacted Growers, reduce Bird Density, increase Downtime, and engage in other illegal and/or unfair practices.

258. Plaintiffs are entitled to damages arising out of Pilgrim's breaches of the BPAs including without limitation, loss of anticipated profits of no less than $75,000, costs of the completed upgrades, loss of equity, diminution in property value, attorneys' fees and costs of litigation, and other compensatory and special damages.

## COUNT II
## BREACH OF CONTRACT – RESPONSIBILITIES OF THE COMPANY

259. Plaintiffs hereby allege and incorporate all the preceding paragraphs as though fully stated herein.

260. Each BPA provides:

RESPONSIBILITIES OF THE COMPANY:

1) **Chicks.**  The Company will provide the Independent Grower with chicks placed from the hatchery without bias in their selection. . . .

2) **Feed.** The Company will provide the Independent Grower with the feed necessary to produce the broilers. . . .

3) **Scheduling, Number, and Breed.**  The Company shall determine the number, frequency of placement, size of broiler, and breed of birds.  The Company will determine when and where the broilers shall be processed and will notify the Independent Grower of the processing arrangements.

4) **Catching and Hauling.**  The Company will provide the labor and equipment necessary to catch and load the broilers, and to haul the flock to a processing plant at no cost to the Independent Grower.

RESPONSIBILITIES OF COMPANY AND INDEPENDENT GROWER

1) **Best Efforts**. The Company and Independent Grower agree to use their best efforts in maintaining broilers in such a manner that optimizes uniformity, health, livability, and the performance of the broilers to market age.

261. Each of these obligations of Pilgrim's give rise to an implied duty of good faith and fair dealing.

262. Pilgrim's reduction in Bird Density placed with Plaintiffs (with no corresponding pay increase) amounted to a breach of the BPAs, and Pilgrim's implied duty of good faith and fair dealing.

263. Pilgrim's increase in Downtime between flocks (with no agreed upon payment compensation) amounted to a breach of the BPAs, and Pilgrim's implied duty of good faith and fair dealing.

264. Pilgrim's failure to consistently provide enough feed for chicks and the inconsistency in catching times (with no agreed upon compensation) amounted to a breach of the BPAs, and Pilgrim's implied duty of good faith and fair dealing.

265. Pilgrim's placement of lesser quality chicks with the Plaintiffs and the related euthanizing limitation amounted to a breach of the BPAs, and Pilgrim's implied duty of good faith and fair dealing.

266. In addition to the damages arising out of these direct breaches, taken together with the Initial NAE Notice Letter and Plaintiffs' communications with Pilgrim's, these actions amounted to a wrongful termination of the Plaintiffs' respective BPAs and a violation of 9 C.F.R. § 201.100(h).

267. Plaintiffs are entitled to damages arising out of Pilgrim's breaches of their respective BPAs, including without limitation, losses on settled flocks, loss of anticipated profits of no less than $75,000, costs of the completed upgrades, diminution in property value, loss of equity, and other compensatory and special damages.

## COUNT III
## VIOLATION OF PSA AND USDA REGULATIONS

268. Plaintiffs hereby allege and incorporate all the preceding paragraphs as though fully stated herein.

269. 7 USC § 209(a) of the Packers and Stockyards Act ("PSA" or "Act"), 7 U.S.C. § 181-229c, provides:

(a)     If any person subject to this chapter violates any of the provisions of this chapter, or of any order of the Secretary under this chapter, relating to the purchase, sale, or handling of livestock, the purchase or sale of poultry, or relating to any poultry growing arrangement or swine production contract, he shall be liable to the person or persons injured thereby for the full amount of damages sustained in consequence of such violation.

63

270.   7 USC 228 of the PSA provides: "The Secretary may make such rules,

regulations, and orders as may be necessary to carry out the provisions

of this chapter. . . ."

271.   The 2008 Farm Bill modified the PSA by pertinently providing:

USCA § 228 NOTE
SEC. 11006. REGULATIONS.
As soon as practicable, but not later than 2 years after the date of the
enactment of this Act, the Secretary of Agriculture shall promulgate
regulations with respect to the Packers and Stockyards Act, 1921 (7
U.S.C. 181 et seq.) to establish criteria that the Secretary will consider
in determining—
(1) whether an undue or unreasonable preference or advantage has
occurred in violation of such Act;
(2) whether a live poultry dealer has provided reasonable notice to
poultry growers of any suspension of the delivery of birds under a
poultry growing arrangement;
(3) when a requirement of additional capital investments over the life
of a poultry growing arrangement or swine production contract
constitutes a violation of such Act; and
(4) if a live poultry dealer or swine contractor has provided a
reasonable period of time for a poultry or a swine production contract
grower to remedy a breach of contract that could lead to termination
of the poultry growing arrangement or swine production contract.

FOOD, CONSERVATION, AND ENERGY ACT OF 2008, PL 110–
246, June 18, 2008, 122 Stat 1651

272.   Pilgrim's demand, especially in light of the limitation on time to do so, that

Plaintiffs upgrade their Grow-out Houses violated 9 C.F.R. § 201.216, a

regulation that was specifically promulgated in response to the 2008 Farm

Bill.

273.   As to upgrades required by Pilgrim's prior to the Initial NAE Notice Letter, Pilgrim's threatened and/or actual termination of the Plaintiffs' BPAs violated 9 C.F.R. § 201.216.

274.   Pilgrim's violated 9 C.F.R. § 201.200(a) by failing to provide "a true written copy of the offered poultry growing arrangement on the date" of the Initial NAE Notice Letter, which was the date Pilgrim's provided the Impacted Growers with the Class AAA poultry house specifications. This violation was especially egregious because of the contradictory information Pilgrim's provided Plaintiffs regarding price per pound for NAE production in Class AAA housing.

275.   Pilgrim's failure to provide reasons for the termination of Plaintiffs' respective BPAs, or in the alternative, reasons consistent with the termination provision thereof, violated 9 C.F.R. § 201.100.

276.   The terms of the broiler production agreements, including the termination provision, violate 9 C.F.R. § 201.100, a regulation that was specifically promulgated in response to the 2008 Farm Bill.  To the extent this allegation is inconsistent with Counts I and II, it is pled in the alternative thereto.

277.   The Initial NAE Notice Letter's failure, which remains uncorrected, to offer Plaintiffs an increase for the upgrade to AAA housing _and_ an increase for

the decrease in Bird Density was false or misleading in contravention of 9 C.F.R. § 201.53.

278.   If Pilgrim's contended that Plaintiffs breached their respective BPAs, Pilgrim's would have been required to provide notice to Plaintiffs in compliance with 9 C.F.R. § 201.217.

279.   Pilgrim's never provided notice to any of Plaintiffs of an alleged breach of their respective BPAs as required by or in compliance with 9 C.F.R. § 201.217.

280.   Plaintiffs are entitled to damages arising out of Pilgrim's breaches of the USDA regulations referenced herein, including without limitation, loss of anticipated profits of no less than $75,000, costs of the completed upgrades, diminution in property value, loss of equity, prejudgment interest, attorneys' fees and costs of litigation, and other compensatory and special damages.

## COUNT IV
## VIOLATION OF 7 U.S.C.A. § 192(A) AND (B) UNDER PSA

281.   Plaintiffs hereby allege and incorporate all the preceding paragraphs as though fully stated herein.

282.   7 USC § 192 pertinently provides:

It shall be unlawful for any packer or swine contractor with respect to livestock, meats, meat food products, or livestock products in

unmanufactured form, or for any live poultry dealer with respect to live poultry, to:

(a) Engage in or use any unfair, unjustly discriminatory, or deceptive practice or device; or

(b) Make or give any undue or unreasonable preference or advantage to any particular person or locality in any respect, or subject any particular person or locality to any undue or unreasonable prejudice or disadvantage in any respect;

7 U.S.C. § 192.

283.   Pilgrim's demand generally, and certainly within the timeframe provided in the Initial NAE Notice Letter, that Plaintiffs upgrade their Grow-out Houses violated 7 U.S.C. § 192(a) and (b), including as construed pursuant to 9 C.F.R. § 201.216.

284.   As to upgrades required by Pilgrim's prior to the Initial NAE Notice Letter, Pilgrim's threatened and/or actual termination of the Plaintiffs' BPAs violated 7 U.S.C. § 192(a) and (b), including as construed pursuant to 9 C.F.R. § 201.216.

285.   Since the 48 Impacted Growers, including many of the Plaintiffs, were disproportionately older, including many over 60, and small Growers with older facilities, Pilgrim's demand that the Impacted Growers upgrade their Grow-out Houses to avoid termination, reduction in Bird Density, failure to offer comparable pay to Class AAA Grow-out Houses, and other practices described herein violated 7 U.S.C. § 192(b) because Pilgrim's made or gave

an undue or unreasonable prejudice or disadvantage to the Impacted Growers, including the Plaintiffs.

286. Pilgrim's requirement of Plaintiffs (which were older and smaller farmers located in or near Athens) to have Class AAA housing for NAE production while allowing other Growers (including at other complexes) to produce NAE poultry using non-Class AAA housing violated 7 U.S.C.A. § 192(b) in that Pilgrim's made or gave an undue or unreasonable prejudice or disadvantage to the Impacted Growers, including Plaintiffs.

287. Since the Growers, including many of Plaintiffs, who received the Initial NAE Notice Letter were disproportionately older, many over the age of 60, and small Growers with older facilities, Pilgrim's demand that Plaintiffs upgrade their Grow-out Houses to avoid termination, reduction in Bird Density, failure to offer comparable pay to Class AAA Grow-out Houses, and other practices described herein violated 7 U.S.C.A. § 192(a) and (b) because Pilgrim's engaged in or used unjustly discriminatory practices and devices.

288. The Initial NAE Notice Letter's failure, which remains uncorrected, to offer Plaintiffs an increase for the upgrade to Class AAA housing _and_ an increase for the decrease in Bird Density violated 7 U.S.C. § 192(a) as an unfair and

deceptive practice or device, including as construed pursuant to 9 C.F.R. § 201.53.

289.  Pilgrim's threatened and actual wrongful termination of Plaintiffs' BPAs, reduction in Bird Density, increase Downtime, allowing flocks to run out of feed for extended period of times, and inconsistent pick-up times, taken together or viewed individually, all violated 7 U.S.C. § 192(a) and (b).

290.  Pilgrim's violated 7 U.S.C. § 192(a) by engaging in the unfair and deceptive practices or devices described herein, including without limitation:

   a.   Pilgrim's failure to provide reasons for termination of Plaintiffs' respective BPAs, or in the alternative, reasons consistent with the termination provision thereof, as required by 9 C.F.R. § 201.100.

   b.   The terms of the BPAs, including the termination provision, fail to satisfy 9 C.F.R. § 201.100.   (To the extent this allegation is inconsistent with Counts I and II, it is pled in the alternative thereto.).

   c.   If Pilgrim's contends that Plaintiffs breached their respective BPAs, Pilgrim's never provided notice to any Plaintiffs of an alleged breach of their respective BPAs as required by or in compliance with 9 C.F.R. § 201.217.

d.   In the case of BMW Farms, the provision of information regarding the availability and timing of the upgrades to BMW Farm's remaining two (2) Grow-out Houses and Pilgrim's refusal to provide reasonable assurances of a contract to a successor in interest to the Comer Farm substantially in the form then existing as to BMW Farms.

e.   The provision of misleading information to Impacted Growers regarding the demand for NAE production, market conditions for NAE product, and known information regarding conditions required for NAE production.

f.   Pilgrim's violation of 9 C.F.R. § 201.200(a) by failing to provide "a true written copy of the offered poultry growing arrangement on the date" of the Initial NAE Notice Letter, which was the date Pilgrim's provided the Impacted Growers with the Class AAA poultry house specifications, or at any subsequent point.

291.   While Plaintiffs contend the likelihood of competitive injury is not a required element for stating a claim for all of the practices or devices described above, the foregoing violations of 7 U.S.C. § 192(a) and (b) all have the likely effect of reducing the NAE poultry output that would have otherwise been created by conversion of the Athens Complex and all of the

Impacted Growers' capacity to NAE, which over time will impact price paid by NAE end-users and creates a likelihood of competitive injury within the NAE poultry market and/or the conventional poultry market. Additionally, the conversion of the Athens Complex to NAE Poultry within and of itself may have a likelihood of competitive injury on the conventional market by reducing the conventional poultry supply (from a historical perspective) in the geography served by the Athens Complex.

292. Plaintiffs are entitled to damages arising out of Pilgrim's breaches of 7 U.S.C. § 192(a) and (b) referenced herein, including without limitation, loss of anticipated profits of no less than $75,000, costs of the completed upgrades, diminution in property value, loss of equity, prejudgment intertest, attorneys' fees and costs of litigation, and other compensatory and special damages.

## COUNT V
## VIOLATION OF GEORGIA'S UNFAIR AND DECEPTIVE PRACTICES TOWARD THE ELDERLY ACT (STANLEY DOVE, JAMES W. DOVE, SANDRA K. WHITE, AND BILLY M. WHITE, SR. ONLY)

293. Plaintiffs hereby allege and incorporate all the preceding paragraphs as though fully stated herein.

294. Pursuant to O.C.G.A. §§ 10-1-851, 853, a cause of action for damages, among other things, will lie where it is found a person, such as Pilgrim's, has

conducted business in violation of Georgia's Uniform Deceptive Trade
Practices Act, O.C.G.A. §§ 10-1-370 et seq., against an elder person.

295.   The Uniform Deceptive Trade Practices Act provides:

(a) A person engages in a deceptive trade practice when, in the course
of his business, vocation, or occupation, he:
. . .
(11) Makes false or misleading statements of fact concerning the
reasons for, existence of, or amounts of price reductions; or
(12) Engages in any other conduct which similarly creates a
likelihood of confusion or of misunderstanding.

O.C.G.A. § 10-1-372(a).

296.   The Initial NAE Notice Letter's failure, which remains uncorrected, to offer
Impacted Growers an increase for the upgrade to Class AAA housing *and* an
increase for the decrease in Bird Density amounted to a false or misleading
statement and/or created a likelihood of confusion and misunderstanding for
the Impacted Growers.   Reduction in Bird Density and the requirement of
Impacted Growers to upgrade to Class AAA Housing were tantamount to a
price reduction for the Grow-out Services.

297.   Pilgrim's threat to terminate the BPAs without a legal basis to do so and, in
some cases, in violation of the USDA regulations, and the reduction in Bird
Density, increase Downtime, statements regarding Bird Density and price
per pound to take effect after the NAE conversion, and other illegal and/or

72

unfair practices created a likelihood of confusion and misunderstanding for the Impacted Growers.

298.   In the case of BMW Farms, Pilgrim's provision of information regarding the availability and timing of the upgrades to BMW Farm's remaining two (2) Grow-out Houses and Pilgrim's refusal to provide reasonable assurances of a contract to a successor in interest to the Comer Farm substantially in the form then existing as to BMW Farms all created a likelihood of confusion and misunderstanding as to BMW Farms.

299.   Many Impacted Growers, including Plaintiffs Stanley Dove, James W. Dove, Sandra K. White, and Billy M. White, Sr., are considered an elder person under O.C.G.A. § 10-1-850(2).

300.   Therefore, Plaintiffs Stanley Dove, James W. Dove, Sandra K. White, and Billy M. White, Sr. are entitled to damages provided for by statute for violation of Georgia's Unfair and Deceptive practices Toward the Elderly Act, including without limitation, costs of the completed upgrades, loss of anticipated profits of no less than $75,000, diminution in property value, loss of equity, prejudgment interest, attorneys' fees and costs of litigation, punitive damages, civil penalties, and other compensatory and special damages.

## COUNT VI
## BREACH OF FIDUCIARY DUTY

301.   Plaintiffs hereby allege and incorporate all the preceding paragraphs as though fully stated herein.

302.   O.C.G.A. § 23-2-58 provides:

Any relationship shall be deemed confidential, whether arising from nature, created by law, or resulting from contracts, where one party is so situated as to exercise a controlling influence over the will, conduct, and interest of another or where, from a similar relationship of mutual confidence, the law requires the utmost good faith, such as the relationship between partners, principal and agent, etc.

303.   Under the BPAs, Pilgrim's was so situated as to exercise a controlling influence over the will, conduct, and interest of the Plaintiffs.

304.   For example, under the BPA, a Grower commits to follow Pilgrim's "written and verbal management recommendations, including, but not limited to, watering, feeding, brooding, sanitation, litter, vaccination, medication, house environment, lighting, pest control and biosecurity."

305.   Relying on this provision, Pilgrim's has terminated at least one Grower associated with the Athens Complex for failing to follow recommendations regarding watering lines and another Grower associated with the Athens Complex for, among other things, "improper housing temperature."

306.   Relying on this provision, Pilgrim's required the Impacted Growers to use a certain vendor for insecticide application to treat Darkling Beetles, even though some of the Plaintiffs are capable of applying, and historically have done so, such insecticides.

307.   For example, Pilgrim's specifies the temperature of the houses at the time chicks are placed and the type and the applicator of ammonia abatement chemicals that are used.

308.   Additionally, Pilgrim's has represented to its investors in its sustainability report:

> Our business can only be successful if our *family farm partners* succeed and are fairly compensated for their work. We value our relationships with our *family farm partners and work in partnership* to raise chickens with improved health, welfare, performance and efficiency.

(emphasis added).

309.   Under the BPA, Pilgrim's has "no obligation whatsoever to approve a transfer of the Independent Grower's rights or obligations under this Agreement . . . or grant a new contract."

310.   Yet since Pilgrim's is a monopsony or is part of an oligopsony for poultry Grow-out Services in and around Athens, Plaintiffs, who have a significant capital investment that is useable only in the poultry industry, did not have a

reasonable opportunity to escape Pilgrim's control by moving to another Integrator.

311. Each Plaintiff is a "poultry grower" as that term is defined in 7 U.S.C. § 182.

312. Each BPA between a Plaintiff and Pilgrim's is a "poultry growing arrangement" as that term is defined in 7 U.S.C. § 182.

313. Pilgrim's is a "live poultry dealer" as that term is defined in 7 U.S.C. § 182.

314. 7 U.S.C. § 197 requires Pilgrim's to hold "[a]ll poultry . . ., all inventories of, or receivables or proceeds from such poultry or poultry products derived therefrom, . . .  in trust for the benefit of all unpaid cash sellers or poultry growers of such poultry, until full payment has been received by such unpaid cash sellers or poultry growers. . . "

315. Therefore, application of 7 U.S.C. § 197 is further evidence that a confidential and/or fiduciary relationship existed between Pilgrim's and the Plaintiffs.

316. Pilgrim's violated its duty of utmost good faith and other fiduciary duties, as established by O.C.G.A. § 23-2-58, through the following acts or omissions:

    a.    Knowingly and willfully failing to promptly disclose to Plaintiffs Pilgrim's plan to convert the Athens Complex to NAE production or to otherwise require Class AAA housing as a prerequisite to continue

to grow for the Athens Complex once it was known that the Athens Complex was going to convert to NAE production;

b.      The imprudent and negligent management, with willful disregard of the consequences of its actions on the Plaintiffs, of production capacity, including available square footage, feed capacity, and chick availability, at the Athens Complex;

c.      Knowingly and willfully failing to compensate the Plaintiffs an agreed upon amount for increased Downtime, and the acts or omissions of Pilgrim's that caused, directly or indirectly, the increased Downtime;

d.      Knowing and willfully failing to compensate the Plaintiffs for reduced Bird Density, and the acts or omissions of Pilgrim's that caused, directly or indirectly, the reduction in Bird Density;

e.      Knowing and willfully failing to compensate Plaintiffs an agreed upon amount for allowing Plaintiffs to repeatedly run out of feed and modified pick-up times after Plaintiffs had begun preparation for catching; and the acts or omissions of Pilgrim's that caused, directly or indirectly, the above-described adverse impacts on Plaintiffs;

f.      Knowingly and willfully failing to compensate Plaintiffs for providing lower quality chicks to Plaintiffs and limiting the euthanizing of

chicks during the first seven (7) days after delivery; and the acts or omissions of Pilgrim's that caused, directly or indirectly, the above-described adverse impacts on Plaintiffs;

g.    The false and misleading statements in the Initial NAE Notice Letter related to the failure to offer Plaintiffs an increase for the upgrade to Class AAA housing *and* an increase for the decrease in Bird Density;

h.    The false and misleading statements related to Pilgrim's rights to terminate under the BPAs, the reduction in Bird Density, increase Downtime, and other illegal and/or unfair practices that induced early termination of the BPAs;

i.    Pilgrim's unreasonable limitation of time for Plaintiffs to make upgrades to Class AAA housing, especially in light of Pilgrim's "definitive plan" regarding NAE production capacity expansion plan and its failure to disclose those plans to Plaintiffs;

j.    In the case of BMW Farms, Pilgrim's provision of false and misleading information regarding the availability and timing of the upgrades to BMW Farm's remaining two (2) Grow-out Houses; and

k.    Pilgrim's use and misuse of it superior and influential position.

317. Many, if not all of the actions described in the proceeding paragraph, were taken by Pilgrim's repeatedly and willfully so as to raise a presumption that Pilgrim's was consciously indifferent to the consequences of Pilgrim's self-serving actions on Plaintiffs and Plaintiffs' interests.

318. Therefore, Plaintiffs are entitled to damages for Pilgrim's breach of its confidential and fiduciary duties owed to Plaintiffs, including without limitation, loss of anticipated profits of no less than $75,000, costs of the completed upgrades, diminution in property value, loss of equity, prejudgment interest, attorneys' fees and costs of litigation, punitive damages, civil penalties, and other compensatory and special damages.

## COUNT VII
## BREACHES OF PRIVATE AND LEGAL DUTIES

319. Plaintiffs hereby allege and incorporate all the preceding paragraphs as though fully stated herein.

320. Pilgrim's violated the PSA (7 U.S.C. § 192(a), (b)) and USDA regulations described in Counts III and IV (the "USDA Regulations"), which are incorporated herein by reference, the BPAs, the common law, and O.C.G.A. § 2-22-2.

321. Pursuant to O.C.G.A. § 51-1-6 a cause of action will lie for breach of a duty arising under a statute or common law.

322.   Pursuant to O.C.G.A. § 51-1-8, a cause of action will lie for breach of a duty arising under a statute or contract, express or implied.

323.   Pilgrim's knowing and willful failure to comply with its duties under the PSA (7 U.S.C. § 192(a), (b)), the USDA Regulations, the BPAs, O.C.G.A. § 2-22-2 and Georgia common law (including without limitation the principles set forth in Tapley v. Youmans, 95 Ga. App. 161, 97 S.E.2d 365 (1957)) has resulted in injury to one or more of Plaintiffs.

324.   For purposes of O.C.G.A. § 51-1-6, Plaintiffs fall within the class of persons that PSA (7 U.S.C. § 192(a), (b)), the USDA Regulations, and O.C.G.A. § 2-22-2 were intended to protect.

325.   The economic harm incurred by Plaintiffs described herein is the harm that the PSA (7 U.S.C. § 192(a), (b)), the USDA Regulations, and O.C.G.A. § 2-22-2 were intended to guard against.

326.   Plaintiffs are entitled to damages arising out of Pilgrim's breaches of O.C.G.A. §§ 51-1-6, 51-1-8 and common law referenced herein, including without limitation, loss of anticipated profits of no less than $75,000, costs of the completed upgrades, diminution in property value, loss of equity, prejudgment interest, attorneys' fees and costs of litigation, and other compensatory and special damages.

## COUNT VIII
## PROMISSORY ESTOPPEL (BMW FARMS ONLY)

327. Plaintiffs hereby allege and incorporate all the preceding paragraphs as though fully stated herein.

328. After receiving the Initial NAE Notice Letter, BMW Farms, consistent with the instructions of the Initial NAE Notice Letter, spoke with Josh Aaron, Pilgrim's broiler manager, about BMW Farms' request to upgrade six (6) Grow-out Houses by the end of 2017 and the remaining two (2) Grow-out Houses within one (1) year.

329. Pilgrim's agreed to this plan, committing to allowing chicks to be placed in all eight (8) Grow-out Houses even if all eight (8) Grow-Out Houses had not been completely updated by the end of 2017.

330. Pilgrim's should have expected BMW Farms to rely on Pilgrim's promise.

331. In fact, Pilgrim's had actual knowledge of BMW Farms' reliance on this promise, as Pilgrim's field representatives were regularly at BMW Farms.

332. In working toward completing the upgrades on the six (6) Grow-out Houses and securing funds through various non-traditional sources to fund the upgrades, BMW Farms relied on the promise of Pilgrim's to continue to place chicks in all eight (8) Grow-out Houses even if all eight (8) Grow-out Houses had not been completely updated by the end of 2017.

333. Pilgrim's breached this promise by refusing to place chicks in all eight (8) Grow-out Houses and categorically refusing to agree to any successor in interest to BMW Farms to place chicks in all eight (8) Grow-out Houses.

334. Therefore, in the alternative to Count I, BMW Farms is entitled under the doctrine of promissory estoppel (or oral modifications to any existing BPA) to damages arising out of Pilgrim's breach of its promises to BMW Farms, including without limitation, loss of anticipated profits of no less than $75,000, costs of the completed upgrades on the six (6) Grow-out Houses, diminution in property value, loss of equity, prejudgment interest, attorneys' fees and costs of litigation, and other compensatory and special damages.

## COUNT IX
## ATTORNEYS' FEES UNDER O.C.G.A. § 13-6-11

335. Plaintiffs hereby allege and incorporate all the preceding paragraphs as though fully stated herein.

336. Pilgrim's has acted in bad faith for the reasons and in the ways set forth above.

337. As such, Plaintiffs are entitled to attorneys' fees and expenses of litigation pursuant to O.C.G.A. § 13-6-11.

**COUNT X**
**PUNITIVE DAMAGES**

338.  Plaintiffs hereby allege and incorporate all the preceding paragraphs as though fully stated herein.

339.  Plaintiffs' tortious actions evince willful misconduct, wantonness, oppression, and an entire want of care, raising the presumption of Pilgrims' conscious indifference to its actions' consequences.

340.  Therefore, Plaintiffs are entitled to punitive damages.

**COUNT XI**
**PREJUDGMENT INTEREST**

341.  Plaintiffs hereby allege and incorporate all the preceding paragraphs as though fully stated herein.

342.  Pursuant to O.C.G.A. § 7-4-2, Plaintiffs are entitled to pre-judgment interest on the amount of damages due hereunder.

WHEREFORE, Plaintiffs respectfully demand as follows:

1)   that a summons be issued and served requiring the Defendant to appear as provided by law to answer this Complaint;

2)   that this case be tried to a jury of twelve;

3)   that Plaintiffs have judgment against Defendant;

4)   that costs of this action be cast against Defendant; and

5)      that Plaintiffs have such other and further relief as is just and proper.

This the <u>27th</u> day of July, 2018.

                                                  **HALL BOOTH SMITH, P.C.**

                                                  ***/s/ Joel L. McKie***
                                                  Joel L. McKie
                                                  Georgia Bar No. 585780
                                                  Andrew K. Hazen
                                                  Georgia Bar No. 101617

191 Peachtree Street NE, Suite 2900
Atlanta, GA  30303
404-954-5000 / 404-954-5020 Fax