IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
ATHENS DIVISION

DAVID ECHOLS, STANLEY DOVE,          *
ALEX MATHEWS, JAMES DOVE *d/b/a*
*Trinity Farm*, TERESA DOVE *d/b/a*  *
*Trinity Farm*, SANDRA WHITE
*d/b/a BMW Farms*, BILLY WHITE,      *
SR. *d/b/a BMW Farms*, and BILLY
WHITE, JR. *d/b/a BMW Farms*,        *
                                          CASE NO. 3:18-CV-100 (CDL)
     Plaintiffs,                     *

vs.                                  *

PILGRIM'S PRIDE CORPORATION,         *

     Defendant.                      *

_____

O R D E R

Americans eat a lot of chicken.  It is estimated that we each consume on average ninety-three pounds of chicken per year.[1] According to a recent survey, nearly nine in ten consumers purchase chicken regularly.[2]  It is big business for chicken farmers and processors.  In recent years, we consumers have demanded chickens that are not pumped full of antibiotics.  And the large chicken processing companies have strived to meet that demand.  These antibiotic-free chickens must be raised differently than antibiotic-treated ones.  These changes give rise to this lawsuit.

---

[1] *See* National Chicken Council, *Survey Shows U.S. Chicken Consumption Remains Strong* (July 24, 2018), https://www.nationalchickencouncil.org/survey-shows-us-chicken-consumption-remains-strong/.
[2] *Id.*

1

Defendant Pilgrim's Pride Corporation is a poultry company. It contracted with Plaintiffs to grow chickens for its Athens, Georgia processing facility.  Plaintiffs' operations were designed to raise healthy and safe-to-eat chickens, using antibiotics as part of the process.  Defendant's customers began demanding "No Antibiotics Ever" ("NAE") chicken.  Plaintiffs' facilities were inadequate for growing these chickens, so Defendant notified Plaintiffs that they must upgrade their facilities to grow NAE chickens.  When Plaintiffs failed to do so, Defendant terminated its contracts with them.  Plaintiffs then brought this action, alleging claims for breach of contract, fraud, breach of fiduciary duty, regulatory violations, and promissory estoppel.  Defendant moved to dismiss (ECF No. 12) pursuant to Federal Rule of Civil Procedure 12(b)(6).  In addition to seeking dismissal of Plaintiffs' claims, Defendant seeks disqualification of their counsel based upon his partner's past representation of Defendant (ECF No. 27).  For the following reasons, Defendant's motion to dismiss and motion to disqualify counsel are denied.

STANDARD

"To survive a motion to dismiss" under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570

(2007)).   The complaint must include sufficient factual allegations "to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.   In other words, the factual allegations must "raise a reasonable expectation that discovery will reveal evidence of" the plaintiff's claims. *Id.* at 556.   But "Rule 12(b)(6) does not permit dismissal of a well-pleaded complaint simply because 'it strikes a savvy judge that actual proof of those facts is improbable.'" *Watts v. Fla. Int'l Univ.*, 495 F.3d 1289, 1295 (11th Cir. 2007) (quoting *Twombly*, 550 U.S. at 556).

## FACTUAL ALLEGATIONS

Plaintiffs alleged the following facts in support of their claims, which the Court accepts as true for purposes of the pending motion:

## I.   Broiler[3] Production Agreements

Defendant operates two hatcheries, a feed mill, and a chicken processing plant near Athens. Compl. ¶ 22, ECF No. 1.  Defendant's Athens plant processes approximately 391 million pounds of chicken each year. *Id.* ¶ 23.  Defendant controls virtually all aspects of broiler production, except for growing the broilers. *Id.* ¶ 20. Instead, under Defendant's standard contractual arrangement,

---

[3] "Broilers" are young chickens bred for meat.  Compl. ¶ 17.  The term is universally used in the chicken business, perhaps because the euphemistic, "growing broilers for production," is more palatable than the potentially insensitive, "raising baby chicks for slaughter."

Defendant provides chicks, feed, medicine, chicken catching services, veterinary services, other technical services, and supervision to poultry growers, like Plaintiffs. *Id.* ¶ 21. In turn, growers provide the housing, utilities, labor, and care necessary to raise the broilers, known as "grow-out services." *Id.* ¶ 24. Defendant classifies each grower's chicken houses into one of four categories: "unimproved," "improved," "Class AA," and "Class AAA." *Id.* ¶ 29. A grower's pay is determined in part by the classification of their chicken houses. *Id.*

Defendant entered a "Broiler Production Agreement" ("BPA") with each Plaintiff to provide grow-out services for the Athens facility. The BPAs provided, "[e]xcept for cause or economic necessity, [Defendant] will not terminate this Agreement and its Exhibits without first requiring Independent Grower to follow the 'Cost Improvement Program.'" 2016 Form BPA 1, ¶ E, ECF No. 1-9.[4] In the "Responsibilities of the Company" section, the BPA obligated Defendant to: (1) provide Plaintiffs "chicks placed from the hatchery without bias in their selection;" (2) provide Plaintiffs "the feed necessary to produce the broilers;" and (3) "provide the labor and equipment necessary to catch and load the broilers." *Id.* at 2, ¶ G(1)-(2), (4). In the "Responsibilities of the

---

[4] Plaintiffs' Complaint alleges that each grower signed a slightly different variant of Defendant's form BPA. The material provisions for purposes of this motion, however, are the same.

Independent Grower" section, the BPAs obligated Plaintiffs to: (1) "provide and maintain proper housing . . . in accordance with the Company's specifications;" (2) "follow . . . the Company's written and verbal management recommendations" regarding "brooding" and "house environment;" and (3) comply with Defendant's "animal welfare program." *Id.* at 2-3, ¶ H(1)-(2), (8). The BPAs further required both parties "to use their best efforts in maintaining the broilers in such a manner that optimizes uniformity, health, livability, and the performance of the broilers to market age." *Id.* at 3, ¶ I(1).

## II. February 2017 "No Antibiotics Ever" Letter

In February 2017, Defendant sent a letter to its non-AAA growers, including Plaintiffs, explaining that "the meat and poultry preference of a large number of consumers worldwide has shifted to animals raised without antibiotics." Compl. ¶ 46; *id.* Ex. B, Letter from A. Hall & J. Aaron to Independent Growers 1 (Feb. 14, 2017), ECF No. 1-4 [hereinafter "NAE Letter"]. Defendant explained that it was transitioning its Athens facility "to NAE (No Antibiotics Ever) poultry production which will require a more stable and controlled house environment than has been required in the past." NAE Letter 1. Therefore, Defendant demanded that Athens growers either upgrade their existing housing or build new housing to Class AAA standards. Compl. ¶¶ 46-47. Defendant explained that base pay would increase accordingly and that

impacted growers could contact Defendant to receive a sample copy
of the BPA for Class AAA houses.  NAE Letter 1.  Defendant gave
impacted growers like Plaintiffs until June 30, 2017 to decide
whether to upgrade.  *Id*.  Defendant stated it would terminate the
current BPAs for growers who did not intend to upgrade or build
new housing.  *Id*.  Conversion of the Athens Complex to NAE had
already been in the works for over a year when Defendant sent the
letter.  Compl. ¶¶ 49-51.[5]

Plaintiffs allege that after Defendant sent the letter, it
implemented a strategy to discourage impacted growers like
Plaintiffs from making the upgrades.  *Id*. ¶ 54.  Defendant's
strategy consisted of the following tactics: (1) reducing bird
density so Plaintiffs could grow fewer broilers; (2) allowing
Plaintiffs to run out of feed; (3) modifying pickup times after
Plaintiffs had prepared for catching; (4) providing lower quality
chicks; and (5) prohibiting euthanasia of chicks within the first
seven weeks.  *Id*. ¶¶ 53, 57-58.  This conduct caused bird
shrinkage, thus reducing Plaintiffs' profits and restricting their
ability to access capital for the required AAA upgrades.  *See id*.
¶¶ 85-86 (describing Echols's reduced bird density); ¶¶ 114-115,
118 (describing Dove's reduced bird density and feed

---

[5] Several months later, the United States Department of Agriculture
("USDA") commenced an investigation into Defendant's NAE transition
actions.  In December 2017, the USDA issued a notice of violation of
several of its regulations based on the February 2017 letter.  *See* Compl.
¶¶ 206-208.

deficiencies); ¶¶ 133-135 (describing Mathews's reduced bird density); ¶¶ 155-157 (describing Trinity Farm's reduced bird density); ¶¶ 187-190, 193 (describing BMW Farms's reduced bird density and feed deficiencies). Defendant also increased Plaintiffs' "downtime" between flocks, thus further reducing Plaintiffs' profit. *Id.* ¶ 87 (Echols); ¶ 116 (Dove); ¶ 136 (Mathews); ¶ 158 (Trinity Farm); ¶ 192 (BMW Farms). Defendant also never offered any Plaintiff the opportunity to grow for its Gainesville complex, which still produced non-NAE chicks in improved or AA housing. *Id.* ¶ 90 (Echols); ¶ 119 (Dove); ¶ 141 (Echols); ¶ 162 (Trinity Farm); ¶ 204 (BMW Farms).

## III. Plaintiffs' Farms

### A.   David Echols

Plaintiff David Echols owns four "improved" chicken houses. *Id.* ¶¶ 59, 64. He started growing broilers for Defendant sometime before 2013. *Id.* ¶ 62. He was an above-average grower. *Id.* ¶¶ 65-66. Before receiving the NAE letter, he invested substantially in his chicken houses with the expectation he would continue to grow broilers for Defendant for years to come. *See id.* ¶¶ 67-74 (describing Echols's infrastructure spending and tractor purchase). Echols signed a new BPA in February 2017. *Id.* ¶ 75. In September 2017, Defendant terminated Echols's BPA because of "new housing specifications being implemented in the Athens Complex to meet the requirements of NAE production." *Id.* ¶ 88;

*see also id*. Ex. E, Letter from A. Hall & J. Aaron to D. Echols (Sept. 4, 2017), ECF No. 1-7.

### B.   Stanley Dove

Plaintiff Stanley Dove owns four "improved" chicken houses. *Id*. ¶¶ 92, 94.  He first grew broilers for Defendant's predecessor entities in 1989, and grew directly for Defendant beginning around 2003.  *Id*. ¶ 93.  Dove was an above-average grower.  *Id*. ¶¶ 95-97.  Before receiving the NAE letter, he invested substantially in his chicken houses with the expectation he would continue to grow broilers for Defendant for years to come.  *Id*. ¶¶ 98-101.  He signed a BPA in May 2017.  *Id*. ¶ 103.  In October 2017, after Dove received the NAE letter, he asked Defendant to stop delivering chicks because of Defendant's unfair practices.  *Id*. ¶ 117.

### C.   Alex Mathews

Plaintiff Alex Mathews owns three "improved" chicken houses. *Id*. ¶¶ 121, 123.   He first grew broilers for Defendant's predecessor entities in 1989, and grew directly for Defendant beginning around 2003.  *Id*. ¶ 122.  He was an above-average grower. *Id*. ¶ 124.   Before receiving the NAE letter, he invested substantially in his chicken houses with the expectation he would continue to grow broilers for Defendant for years to come.  *Id*. ¶¶ 125-128.  Mathews signed a BPA similar to the 2016 form BPA. *Id*. ¶ 129.  In July or August 2017, after receiving the NAE letter,

he told Defendant to stop delivering chicks because of Defendant's uncompensated reduced bird density.  *Id*. ¶ 138.

### D.   Trinity Farm

James and Teresa Dove, doing business as Trinity Farm, own two "improved" chicken houses.  *Id*. ¶¶ 143, 145.  Trinity Farm first grew broilers for Defendant's predecessor entities in 1990, and grew directly for Defendant beginning around 2003.  *Id*. ¶ 144. Trinity Farm was an above-average grower.  *Id*. ¶ 146.  Before receiving the NAE letter, Trinity Farm invested substantially in its chicken houses with the expectation it would continue to grow broilers for Defendant for years to come.  *Id*. ¶¶ 147-151.  Trinity Farm signed numerous BPAs over the years.  *Id*. ¶ 152.  Trinity Farm concluded the costs of the required upgrades in the NAE letter were too high.  *Id*. ¶ 154.  Defendant stopped delivering chicks to Trinity Farm in February 2018.  *Id*. ¶ 160.

### E.   BMW Farms

Sandra White, Billy White, Sr., and Billy White, Jr., doing business as BMW Farms, purchased a farm with eight chicken houses in 2007 and started growing broilers for Defendant.  *Id*. ¶¶ 164, 166.[6]  Defendant classified BMW Farms's houses as both "improved" and "Class AA."  *Id*. ¶ 170.  BMW Farms executed a BPA in 2014, and perhaps on a subsequent occasion prior to February 2017.  *Id*.

---

[6] The farm actually contained eleven houses, but Defendant refused to place flocks in three of the older houses because BMW Farms was unwilling to make Defendant's requested upgrades.  Compl. ¶ 168.

¶ 172.   Before receiving the NAE letter, BMW Farms invested substantially in its chicken houses with the expectation it would continue to grow broilers for Defendant for years to come.   *Id* ¶¶ 174-178.

After receipt of the NAE letter, Billy White, Jr. spoke with Defendant's broiler manager for the Athens complex to request more time to make the required upgrades.   *Id*. ¶ 180.   During the conversation, Defendant and BMW reached an agreement that BMW would upgrade six of its houses by the end of 2017 and the remaining two houses within the next year, with no interruption in chick placement by Defendant.   *Id*. ¶¶ 180-181.   BMW Farms then invested substantially to upgrade six of their houses to AAA standard.   *Id*. ¶¶ 183-185.   Defendant then informed BMW it had "written off" the remaining two houses and would not continue to place chicks in those houses, thus decreasing BMW's income during the upgrade process.   *Id*. ¶ 199.   Because of Defendant's reneging on the agreement, the severe financial impact of the upgrades to six houses, decreased bird density, and decreased downtime between flocks, BMW Farms stopped growing for Defendant.   *Id*. ¶ 203.

## MOTION TO DISMISS DISCUSSION

Plaintiffs contend Defendant breached the BPAs in two ways: (1) wrongfully terminating the BPAs without cause and (2) failing to fulfill their responsibilities under the BPAs.   Plaintiffs bring the following additional claims: (1) violations of USDA

regulations promulgated pursuant to the Packers and Stockyards Act ("PSA"), 7 U.S.C. § 209(a); (2) violations of 7 U.S.C. §§ 192(a)-(b) of the PSA; (3) violations of the Georgia Uniform Deceptive Trade Practices Act ("UDTPA"), O.C.G.A. §§ 10-1-370 *et seq.*; (4) breach of fiduciary duty under O.C.G.A. § 23-2-58; (5) violations of O.C.G.A. § 51-1-6 for breach of statutory or common law duties and § 51-1-8 for breach of statutory or contractual duties; (6) promissory estoppel claim for BMW Farms only; (7) attorneys' fees under O.C.G.A. § 13-6-11; and (8) punitive damages. Defendant moved to dismiss all of Plaintiffs' claims.  The Court addresses these claims in turn.

## I.   Count One: Breach of Contract (Wrongful Termination)

Plaintiffs allege that Defendant breached the BPAs by terminating the agreements without cause.  Defendant moves to dismiss this state law breach of contract claim because it properly terminated the BPAs for cause—Plaintiffs' failure to provide housing and services according to Defendant's specifications. Defendant also argues that Plaintiffs waived these claims.  As explained below, the Court finds that Plaintiffs have alleged adequate facts, which must be accepted as true at this stage of the litigation, that would excuse Plaintiffs' failure to provide adequate NAE broiler housing and services and that would support a breach of contract claim.

A.   Breaches by Plaintiffs

Defendant contends Plaintiffs' refusals to upgrade constitute a breach of the BPA provisions requiring them to maintain proper housing in accordance with Defendant's specifications, follow Defendant's recommendations regarding brooding and house environment, comply with Defendant's animal welfare program, and use their best efforts to optimize the broilers' performance. Thus, Defendant argues it had sufficient "cause" to exercise their termination rights under the BPAs and that Plaintiffs' wrongful termination claims against it must therefore fail.

The Court agrees with Defendant's interpretation of the BPAs as it relates to housing specifications.  The agreement plainly states that Plaintiffs shall "provide and maintain proper housing . . . in accordance with the Company's specifications." When Defendant modified its production model to produce more NAE broilers, it had to change the way those broilers were raised. And it had the authority to require its growers to accommodate those changes by upgrading their facilities according to Defendant's specifications.  There is no qualifier on the type of specifications Defendant may mandate.  The BPAs do not indicate that they are subject to negotiation.  The parties agreed in the BPAs that Plaintiffs were required to meet Defendant's specifications.  When Defendant specified that the growers must improve facilities to grow NAE broilers, Plaintiff had no choice

but to comply if they wished to continue to grow chickens for Defendant.

If that were the end of the story (or the extent of the allegations), Plaintiffs' breach of contract claim based upon wrongful termination of the BPAs would have to be summarily dismissed because Plaintiffs indisputably failed to do what the contract required, i.e., construct NAE-specific housing.  And a failure to do what the contract required would certainly constitute good cause for termination.  But Plaintiffs allege that Defendant hatched a more nefarious plot.  They maintain that Defendant never wanted them to upgrade to produce NAE broilers; they in fact wanted to get rid of them.  So, according to Plaintiffs' assumed-to-be-true complaint, Defendant prevented Plaintiffs from complying with the specifications that Defendant imposed on them.  And they argue that even if Defendant had the contractual right to impose those specifications, it did not have good cause to terminate the contracts when it had impeded Plaintiffs' compliance with them.

Plaintiffs are entitled to develop the factual record on this theory.  They have alleged enough to avoid dismissal at this stage of the proceedings.  Defendant's motion to dismiss Plaintiffs' breach of contract claim based upon wrongful termination of the BPAs is denied.

### B.    Waiver

Defendant argues that even if it breached the BPAs by terminating them without cause, Plaintiffs waived these claims by instructing Defendant to stop delivering chicks. While Defendant will certainly have the opportunity to assert this affirmative defense, the Court finds it inappropriate to dismiss Plaintiffs' Complaint pursuant to Rule 12(b)(6) on this ground, particularly when Plaintiff has alleged facts that may create a factual dispute with regard to this defense. *See Twin City Fire Ins. Co. v. Hartman, Simons & Wood, LLP*, 609 F. App'x 972, 976 (11th Cir. 2015) (per curiam) (explaining that waiver is an affirmative defense and that a plaintiff is "not required to negate an affirmative defense in [its] complaint" (alteration in original) (quoting *La Grasta v. First Union Sec., Inc.*, 358 F.3d 840, 845 (11th Cir. 2004))).[7]

## II.  Count Two: Breach of Contract (Company Responsibilities)

Plaintiffs allege Defendant further breached the BPAs by failing to fulfill its obligations outlined in the BPA's

---

[7] Defendant also argues that Plaintiffs' claims should be dismissed to the extent they rely on Defendant's violation of 9 C.F.R. § 201.217. That regulation enumerates several criteria the Secretary of Agriculture may consider when determining whether a company like Defendant provided contract growers like Plaintiffs "a reasonable period of time to remedy a breach of contract that could lead to contract termination." 9 C.F.R. § 201.217.   Whether Defendant violated this regulation is irrelevant at this stage to determine whether Plaintiffs have alleged sufficient facts to prevail on their breach of contract claims. Accordingly, the Court does not address this argument. Additionally, because the Court concludes Plaintiffs have sufficiently alleged Defendant terminated their BPAs without cause, the Court need not address whether Defendant complied with the 90-day written notice of termination requirement.

"Responsibilities of the Company" section. Specifically, Plaintiffs allege that after sending the NAE Letter, Defendant delivered inferior chicks, did not provide the "necessary" feed, did not provide the "necessary" equipment and labor for pickup, and did not use its "best efforts" to assist in growing the broilers, all in violation of the clear terms of the BPAs. Plaintiffs contend that Defendant's failure to comply with these obligations was done purposefully to assure that Plaintiffs could not upgrade their facilities as demanded by Defendant. Defendant responds that it had broad discretion in how to fulfill these obligations. Defendant is correct, but that discretion was not unbridled. It could not abuse that discretion, which is what Plaintiffs allege was done. Plaintiffs have alleged sufficient facts to support a state law breach of contract claim. Therefore, Defendant's motion to dismiss on this ground is denied.

## III. Counts Three and Four: PSA Claims

Plaintiffs contend that Defendant terminated their BPAs in violation of the PSA. Section 192(a) of the PSA prohibits poultry processors from engaging in or using any "unfair, unjustly discriminatory, or deceptive practice or device." 7 U.S.C. § 192(a). Section 192(b) prohibits poultry processors from subjecting "any particular person or locality to any undue or unreasonable prejudice or disadvantage in any respect." *Id.* § 192(b). The PSA further grants the Secretary of Agriculture

authority to "make such rules, regulations, and orders as may be necessary to carry out the provisions" of the Act. *Id.* § 228(a). Here, Plaintiffs contend Defendant violated both the above statutory provisions and the following PSA regulations: 9 C.F.R. § 201.53 ("Misleading Report Rule"); *id.* § 201.100 ("Record Furnishing Rule"); *id.* § 201.216 ("Additional Capital Investments Rule"); and *id.* § 201.217 ("Notice and Right to Cure Rule").[8]

Defendant seeks dismissal of Plaintiffs' PSA claims for three reasons. First, it argues that the PSA does not provide a private right of action for violation of regulations promulgated pursuant to the statute. Second, it maintains that an essential element of Plaintiffs' PSA claims is a showing that Defendant's violations of the statute or the regulations had an anticompetitive impact, and Plaintiffs have failed to adequately allege such facts. And third, Defendant contends that it had legitimate business reasons for its conduct. The Court addresses these grounds for dismissal in turn.

A.   Plaintiffs Have Standing to Assert Regulatory Claims

The PSA states: "If any person subject to this chapter violates any of the provisions of this chapter, or of any order of the Secretary [of Agriculture] under this chapter . . . relating

---

[8] Plaintiffs mistakenly reference 9 C.F.R. § 201.200(a) in their Complaint. *See* Compl. ¶¶ 274, 290(f). That regulation governs the sale of "livestock" to a packer on credit. Plaintiffs explain in their response that they intended to reference § 201.100 and its provisions regarding contract termination.

to any poultry growing arrangement . . . he shall be liable to the person or persons injured thereby for the full amount of damages sustained in consequence of such violation."  7 U.S.C. § 209(a). It further states that such liablity may be enforced "by suit in any district court of the United States."  *Id*. § 209(b).  Thus, the PSA explicitly provides a private right of action for persons injured by violations of the statute or an order of the Secretary.

Defendant argues that while Congress may have provided a private right of action for violations of the *statute* or the Secretary's *order*, it did not extend that right to claims based upon alleged violations of regulations promulgated pursuant to the statute.  Defendant's argument cannot be reconciled with Supreme Court precedent.  *See Alexander v. Sandoval*, 532 U.S. 275, 284 (2001) (noting that "[a] Congress that intends the statute to be enforced through a private cause of action intends the authoritative interpretation of the statute to be so enforced as well" and that it is therefore "meaningless to talk about a separate cause of action to enforce the regulations apart from the statute"); *see also Global Crossing Telecomms., Inc. v. Metrophones Telecomms., Inc.*, 550 U.S. 45, 54 (2007) ("[T]o violate a regulation that lawfully implements [a statute's] requirements *is* to violate the statute.").  Accordingly, Plaintiffs have standing to assert claims for violations of the PSA and the

regulations promulgated thereunder.  Defendant's motion to dismiss on this ground is denied.

> **B.**  Plaintiffs Have Adequately Pled Harm to Competition, as Required by the PSA

Defendant is correct that for Plaintiffs to prevail on their PSA claims, they must show that the violations adversely affected, or were likely to adversely affect, competition.  *See London v. Fieldale Farms Corp.*, 410 F.3d 1295, 1303 (11th Cir. 2005) (holding that "to succeed on a claim under the PSA, a plaintiff must show that the defendant's unfair, discriminatory or deceptive practice adversely affects or is likely to adversely affect competition").[9] Plaintiffs' argument that *London* has been abrogated by subsequent regulatory decision-making by the Secretary is unpersuasive. Furthermore, Plaintiffs' contention that they must show an anticompetitive impact for only some of their PSA claims ignores the clear language and rationale of the *London* decision.  If Plaintiffs wish to escape *London* in this Circuit*,* they must find a way to enlist the help of the Supreme Court or Congress.

Defendant seeks dismissal of Plaintiffs' PSA claims because Plaintiffs have not adequately alleged facts that plausibly suggest that Defendant's alleged violations adversely affected, or were likely to adversely affect, competition.  Plaintiffs' burden,

---

[9] Defendant contends Plaintiffs must show "actual" rather than "likely" harm to competition to prevail on claims for money damages.  But this flies in the face of the express language and facts of *London*.

while substantial, is not insurmountable.  The *London* decision provides some guideposts.

The Eleventh Circuit did not expressly adopt the antitrust "rule of reason" analysis for PSA claims in *London*, but it did identify the following types of evidence relevant to the harm to competition inquiry in this context: (1) evidence of the total number of growers in the relevant area; (2) evidence regarding the percentage of the chicken market a defendant controls; and (3) evidence of plaintiff and defendant's relative stature in the chicken industry.  *London*, 410 F.3d at 1305.  The *London* court affirmed the district court's dismissal of plaintiffs' PSA claims based on lack of evidence of these factors, and these factors are largely the same ones the Eleventh Circuit has identified as relevant in the rule of reason analysis.  *See Pickett v. Tyson Fresh Meats, Inc.*, 420 F.3d 1272, 1286 (11th Cir. 2005) (applying rule of reason analysis when affirming judgment as matter of law on plaintiffs' PSA claims when plaintiff "did not present any evidence from which a reasonable jury could conclude that [the defendant] lacked pro-competitive justifications" for its conduct).

Here, Plaintiffs allege that Defendant is a monopsonist or part of an oligopsony in Madison and Oglethorpe counties.[10]

---

[10] A monopsony or oligopsony is a market condition where there is only one or are only a few buyers for a particular commodity.

Plaintiffs also allege that Defendant is the second-largest poultry producer in the world, while they are smaller family farms. Plaintiffs further allege that Defendant's "threatened and actual wrongful termination of Athens Complex's Impacted Growers (including Plaintiffs), reduction in Bird Density, increase in Downtime, allowing flocks to run out of feed for extended periods of time[], and inconsistent pick-up times were all aspects of [Defendant's] overall calculated strategy . . . to reduce NAE poultry output that would have otherwise been created by conversion of the Athens Complex and all of its Impacted Growers' square footage capacity to NAE." Compl. ¶ 234. Plaintiffs state that "[s]uch acts or practices, when the Integrator is a monopsony or part of an oligopsony, will, over time, impact price paid by NAE end-users and create[] a likelihood of competitive injury within the NAE poultry market and/or the conventional poultry market." *Id*. ¶ 235. Thus, Plaintiffs allege that Defendant forced them out of business and converted its Athens Complex to NAE production in an effort to reduce supply of NAE and conventional product, thereby driving demand and increasing price. The Court finds these allegations sufficient at this stage to satisfy the PSA requirement that the alleged violations adversely affected, or were likely to adversely affect, competition. Defendant's motion to dismiss based on Plaintiffs' failure to adequately plead their PSA claims is denied.

20

C.   Valid Business Justifications

Defendant argues that even if Plaintiffs can assert regulatory and statutory claims under the PSA, the claims fail because Defendant had a valid business justification for its conduct.  But Plaintiffs have alleged facts plausibly suggesting that Defendant did not have a legitimate business reason for engaging in the conduct of which it is accused.  The Court does not weigh the evidence at the motion to dismiss stage.  It must accept Plaintiffs' factual allegations as true.  Plaintiffs have sufficiently alleged facts, which if proven, could support a finding that no procompetitive rationale justified Defendant's conduct.  Accordingly, Defendant's motion to dismiss on this ground is denied.[11]

**IV.  Plaintiffs' Remaining Claims: Count Five (Georgia Uniform Deceptive Trade Practices Act), Count Six (Breach of Fiduciary Duty), Count Seven (Tort Claims), Count Eight (BMW Farms Promissory Estoppel Claim), Count Nine (Attorneys' Fees and Punitive Damages)**

Defendant's arguments regarding the remaining claims in Plaintiffs' Complaint sound more appropriate for a summary judgment motion than a motion to dismiss.  Accepting Plaintiffs' factual allegations to be true, as it must at this stage of the

---

[11] Defendant also summarily asserts that Plaintiffs have alleged insufficient facts to prove violations of the PSA or the regulations. The Court has reviewed Plaintiffs' 84-page, 342-paragraph Complaint and finds it states sufficient facts to clear the 12(b)(6) hurdle.

proceedings, the Court denies Defendants' motion to dismiss these claims.

MOTION TO DISQUALIFY COUNSEL

Defendant contends Plaintiffs' lead counsel and his law firm, Joel McKie of Hall Booth Smith, P.C. ("Hall Booth"), should be disqualified based on an imputed conflict of interest.  Another Hall Booth partner, David Proctor, previously represented Defendant in litigation involving more than a dozen growers in Alabama who alleged unfair practices by Defendant.  In the Alabama litigation, Proctor served as Defendant's local counsel, and Clayton Bailey, Defendant's lead counsel in this action, served as Defendant's lead counsel.  They consulted frequently during the Alabama litigation.  Defendant thus contends that Proctor's prior representation disqualifies Hall Booth from representing Plaintiffs in this case.

## I.  Applicable Law

"The party bringing the motion to disqualify bears the burden of proving the grounds for disqualification." *Herrmann v. GutterGuard, Inc.*, 199 F. App'x 745, 752 (11th Cir. 2006) (per curiam).  "Because a party is presumptively entitled to the counsel of his choice, that right may be overridden only if 'compelling reasons' exist." *Id.* (quoting *In re BellSouth Corp.*, 334 F.3d 941, 961 (11th Cir. 2003)).  "A disqualification order 'is a harsh sanction, often working substantial hardship on the client' and

should therefore 'be resorted to sparingly.'"  *Id.* (quoting *Norton v. Tallahassee Mem'l Hosp.*, 689 F.2d 938, 941 n.4 (11th Cir. 1982)).  Motions to disqualify "should be viewed with caution," as they can "be misused as a technique of harassment."  Ga. Rules of Prof'l Conduct, R. 1.7 cmt. 15.

Defendant contends Hall Booth violated Georgia Rule of Professional Conduct 1.9(a).[12]  That Rule states: "A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent, confirmed in writing."  The parties do not dispute that Proctor previously represented Defendant, that Plaintiffs' interests are materially adverse to Defendant's, that Proctor's duties are imputed to other Hall Booth lawyers under Rule 1.10(a), and that Defendant did not consent to the representation.  Therefore, the resolution of Defendant's motion turns on whether the Alabama litigation is "substantially related" to this matter.

The focus of the Court's substantial relation inquiry "should be on the precise nature of the relationship between the present

---

[12] Plaintiffs appear to argue that Rule 1.9(b) applies.  That rule applies when a lawyer leaves a firm and seeks to represent a client adverse to the lawyer's former firm.  That is not the situation presented here.

and former representations." *Herrman*, 199 F. App'x at 752-53
(quoting *Duncan v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
646 F.2d 1020, 1029 (5th Cir. Unit B 1981)). "The court can only
determine if the substantial relationship test has been met 'when
the moving party delineates with specificity the subject matters,
issues, and causes of action presented in the former
representation.'" *Id.* at 753 (quoting *Cox v. Am. Cast Iron Pipe
Co.*, 847 F.2d 725, 730 (11th Cir. 1988)). "The moving party has to
show more than the mere fact that as a result of a former
representation, the attorney has knowledge of the moving party's
practices and procedures." *Id.*

Comment 3 to Rule 1.9 states: "Matters are 'substantially
related' . . . if they involve the same transaction or legal
dispute or if there otherwise is a substantial risk that
confidential information as would normally have been obtained in
the prior representation would materially advance the client's
position in the subsequent matter." "In the case of an
organizational client, general knowledge of the client's policies
and practices ordinarily will not preclude a subsequent
representation; on the other hand, knowledge of specific facts
gained in a prior representation that are relevant to the matter
in question ordinarily will preclude such a representation." Ga.
Rules of Prof'l Conduct, R. 1.9 cmt. 3. Defendant is not required
to reveal the confidential information learned by Proctor to

establish "a substantial risk" that Proctor has confidential information to use in this matter. *Id*. Instead, "[a] conclusion about the possession of such information may be based on the nature of the services the lawyer provided the former client and information that would in ordinary practice be learned by a lawyer providing such services." *Id*.

## II.  Analysis

The Alabama litigation and this action are not substantially related.  The Alabama complaint summarizes the plaintiffs' claims as follows: "For several years, the Plaintiffs grew and raised chickens for [Defendant] based upon the oral and written representations made to them that the Plaintiffs would be paid by the actual pound per bird (chicken), with more money being paid to the Plaintiffs for a higher average bird (chicken) weight, and less money being paid to the Plaintiffs for a lower average bird (chicken) weight."  Def.'s Mot. to Disqualify Counsel Ex. 1-A, Ala. Compl. ¶ 26, ECF No. 27-3.  But instead, according to the Alabama Plaintiffs, Defendant employed "an undisclosed scheme put in place by [Defendant's agent] that ensured Plaintiffs were not ever paid for the actual weight of their birds (chickens), but were instead paid on a 'watered down' weight basis."  *Id*. ¶ 27; *see also* Pl.'s Br. in Opp'n to Def.'s Mot. to Disqualify Ex. M, Ala. Pretrial Order ¶ 5(c), *Adams v. Bradford et al.*, No. 6:16-cv-02227-LSC (N.D. Ala. July 28, 2017), ECF No. 35-13 (describing

same claims).   Based on these allegations, the Alabama Plaintiffs asserted four claims: (1) fraudulent misrepresentation; (2) fraudulent suppression; (3) negligence and wantonness; and (4) civil conspiracy.  Ala. Compl. ¶¶ 32-42.  Accordingly, at its core, the Alabama litigation involved allegations of fraud claiming that Defendant purposefully cheated the growers out of what they were due based on manipulation of the broiler weights. *See* Pl.'s Br. in Opp'n to Def.'s Mot. to Disqualify Ex. L, Mem. in Supp. of Defs.' Mot. to Dismiss 1, No. 6:14-CV-00444-LSC (N.D. Ala. Mar. 20, 2014), ECF No. 35-12 ("The gravamen of [the Alabama Plaintiffs'] complaint is that [Defendant's agents] made oral and written representations to Plaintiffs about the formula used to calculate grower pay that were untrue.").

In this case, however, Plaintiffs do not dispute whether Defendant properly calculated the weight of their broilers or followed the relevant formula to determine their pay.  Plaintiffs do not assert any fraud-based claims based on their pay schedule. Indeed, Plaintiffs do not assert any of the same claims in their Complaint at all.  Plaintiffs do contend, however, that Defendant engaged in a scheme of decreased bird density, inferior chick delivery, and irregular feed delivery and catching times after the February 2017 NAE Letter to depress the Plaintiffs' pay and

dissuade upgrade.[13]  But these allegations are different from the conduct alleged in the Alabama litigation.  Those claims were about misrepresentations regarding grower pay.  The claims here are about the propriety of Defendant's upgrade demand.  Therefore, Proctor's participation in the Alabama litigation does not pose a substantial risk that Hall Booth has acquired confidential information that would materially advance their prosecution of the substantively different claims in this case.  Proctor's acquisition of knowledge regarding Defendant's general approach to grower litigation is not disqualifying.  *See* Ga. Rules of Prof'l Conduct R. 1.9 cmt. 3.  The matters are sufficiently dissimilar to permit Hall Booth to represent Plaintiffs in this case.

## III. Contractual Jury Trial Waivers

The only specific issue Defendant identifies that Proctor worked on in the Alabama litigation that could be similar here is the enforceability of the jury trial waivers in the Plaintiffs' BPAs.  In the Alabama litigation, Proctor successfully filed a motion to strike the Alabama plaintiffs' jury demand under Alabama law based on the same waiver that is included in the Plaintiffs' BPAs in this action.  Defendant contends it will be prejudiced because Hall Booth will use Proctor's knowledge of Defendant's

---

[13] The Court is unpersuaded by Defendant's citations to snippets of deposition testimony from the Alabama litigation.  Those excerpts appear to obliquely address some of these same issues in the Alabama litigation.  But review of the depositions demonstrates the issues are discussed only as ancillary topics in the numerous depositions taken in those cases.

strategy for enforcing the waiver against it during this litigation.   The BPAs in this action clearly provide, however, that Georgia law will govern.  *See* 2016 Form BPA 4, ¶ 18, ECF No. 1-9 (providing that the laws of the state in which the farm is located shall govern the interpretation of the contract).  Because different law applies, the Court finds that Defendant will not be prejudiced by Proctor's involvement on an issue under different law.  Without deciding the matter, the Court also observes that Georgia law appears clear on the issue.  And if that is the case, it should not be a contested matter.  *See Bank South, N.A. v. Howard*, 444 S.E.2d 799, 800 (Ga. 1994)("[P]re-litigation contractual waivers of the right to trial by jury are not enforceable in cases tried under the laws of Georgia."); *see also GE Commercial Fin. Bus. Prop. Corp. v. Heard*, 621 F. Supp. 2d 1305, 1308-09 (M.D. Ga. 2009) (recognizing this rule in this Court in breach of contract claims).

## IV.   Summary

Defendant has failed to carry its burden of showing that the Alabama action and this action are so substantially related that Plaintiffs' choice of counsel should be disqualified from

participating in this action.   Accordingly, the motion to disqualify is denied.[14]

CONCLUSION

As explained above, Defendant's motion to dismiss (ECF No. 12) and motion to disqualify (ECF No. 27) are denied.  The parties shall submit a proposed scheduling order within twenty-one days of today's Order.  *See* Rules 16 and 26 Order (Oct. 10, 2018), ECF No. 19.

IT IS SO ORDERED, this 5th day of April, 2019.

S/Clay D. Land
_____
CLAY D. LAND
CHIEF U.S. DISTRICT COURT JUDGE
MIDDLE DISTRICT OF GEORGIA

---

[14] If Defendant wishes to pursue an immediate appeal of this issue, it shall file a motion for a certificate of immediate appeal within 14 days of today's Order.  The Court will only consider a request for a certificate related to the denial of its disqualification motion and not its motion to dismiss.